[No. D022306. Fourth Dist., Div. One. Oct. 10, 1997.]

GARY D. ARONSON, Plaintiff and Appellant, v.
KEVIN J. KINSELLA, Defendant and Appellant.

**COUNSEL**

Meisenheimer and Herron, Matthew V. Herron and Robert M. Steele for Plaintiff and Appellant.

Sobel & Custer, Janet E. Sobel and Patricia Jo Custer for Defendant and Appellant.

## OPINION

**KREMER, P. J.**—Gary D. Aronson appeals a summary judgment on his defamation action against Kevin J. Kinsella. Aronson contends the court misapplied the standard for determining whether prelitigation statements are covered by the litigation privilege (Civ. Code,[1] § 47, subd. (b)) and improperly ruled Kinsella had not waived the attorney-client and work product privileges. Kinsella also appeals, contending summary judgment should have been granted on the ground Aronson could prove no damages and therefore was libel-proof. We affirm.

### FACTS

In 1983, Kinsella formed the venture capital firm of Avalon Ventures (hereafter Avalon). Avalon was involved in the founding of Vertex Pharmaceuticals (hereafter Vertex) (in 1989) and GenPharm International (in 1988).

In May 1987, Avalon entered into a "letter agreement" with Aronson where Avalon agreed to assign one-third of any founders' stock or warrants which Avalon received in new start-up companies and to reimburse Aronson's expenses for "any new start-up company that [Aronson] might bring to [Avalon] which [met] [Avalon's] investment criteria," providing Aronson originated the idea for the company and did "sufficient work to determine the potential upside of the company."[2] While with Avalon, Aronson worked on the Vertex project. He also worked on the Chimera project. Chimera Biotech (hereafter Chimera) was a company which later became a part of GenPharm International. By March 1990, Aronson was no longer working with Avalon.

Kinsella and Aronson disputed how much Aronson contributed to the formation of Vertex and GenPharm International.

---

[1]All statutory references are to the Civil Code unless otherwise specified.

[2]The letter went on to explain "[s]uch work would include, but [was] not . . . limited to, the following:

"a. Identifying the potential market.

"b. Determining the product development timeframe.

"c. Evaluating potential competitors and the barriers to entry for potential future competitors.

"d. Identifying the key technical people required to get the company organized.

"e. Evaluating the potential impact of any regulatory requirements.

"f. Prepare a preliminary budget of how much money will be spent during the organizational phase of the company's development."

According to Kinsella, in the biotechnology venture capital field a person who has helped to "establish," to "found," or to "finance" a start-up company means the individual was a "prime mover" in the formation of the company and was involved in recruiting leading scientists with promising technologies, preeminent advisers and experienced business managers; developing business plans; and providing capital and seeking additional investors from the venture capital community. Kinsella stated Aronson did not help to found or finance Vertex because Aronson "performed none of the primary tasks typically considered to be involved in founding a company," i.e., recruiting scientific advisors, management personnel or employees, facilitating the acquisition of any technology, bringing in financing, or making any substantial or important contributions to Vertex's business plan. According to Kinsella, he rather than Aronson performed these tasks.

According to Kinsella, Aronson never worked on the formation or financing of GenPharm International but worked directly for Kinsella only on Chimera, a company which was later acquired by GenPharm International. When Chimera was acquired by GenPharm International, Aronson's consulting work on this project ended. Aronson's final compensation for work performed on Chimera was paid by GenPharm International as successor to Chimera's obligation.

Aronson presented evidence, including his declaration, tending to support a conclusion he was involved in helping to found or finance Vertex. Among other things, there was a letter of reference for Aronson by Lawrence Bock who became a partner in Avalon in 1989. This letter, written in March 1990 states: "In the case of both GenPharm and Vertex, Mr. Aronson made major contributions and received an equity interest as part of his compensation."[3]

Aronson stated in a declaration that he helped to establish and/or finance not only Vertex but also "GenPharm." In his deposition, he stated he had worked on Chimera which merged with GenPharm to create GenPharm International and since he "performed considerable work" on one of the two companies which formed GenPharm International, he concluded he "performed work on the resultant company."

A dispute arose between Aronson and Kinsella about the amount of compensation Aronson was entitled to for working on the Vertex project. Avalon filed a declaratory relief action in February 1991 against Aronson and Aronson's consulting company. Aronson cross-complained against Avalon and Kinsella for breach of the May 1987 letter agreement. The jury

[3]In a deposition, Bock stated Aronson drafted the letter and told Aronson he thought it "was a gross exaggeration," but he was willing to sign the letter "as a friend."

awarded Aronson over $1.6 million (the value of one-third of Avalon's stock and warrants in Vertex at that time) on Aronson's breach of contract claim. The trial judge decided the quantum meruit value of Aronson's services to Avalon was $300,000.

In 1992, Aronson was president of DepoTech Corporation (hereafter DepoTech), a biotechnology company. DepoTech circulated a business plan to raise investment capital which stated, inter alia, that Aronson had assisted in "the founding of seven companies and the financing of two others. These companies include: . . . GenPharm International, Vertex Pharmaceuticals . . . ." The business plan also included Aronson's resume which stated he "helped to establish and/or finance" the companies listed in the business plan.

Kinsella received a portion of this business plan from another venture capitalist in July 1992. Kinsella objected to Aronson taking credit for the founding or financing of GenPharm International and Vertex because Kinsella believed he had founded or financed those companies. Kinsella retained a law clerk to do legal research on DepoTech's claims in his business plan and consulted with three different attorneys about whether he had a basis for suing Aronson for making false claims. The attorneys advised him he had a valid claim. Kinsella stated he intended to bring whatever legal action would be necessary to stop DepoTech (and Aronson) from continuing "this false advertising and unfair business competition." One of Kinsella's attorneys, Michael O'Donnell, testified in his deposition that Kinsella stated he would pursue a lawsuit if the matter were not resolved.

On October 26, 1992, Kinsella's attorney, Mauricio Flores, wrote the following letter to the chairman of DepoTech:

"We represent Mr. Kevin J. Kinsella. It has come to our attention that you are listed as the Chairman and Chief Executive of DepoTech Corporation of San Diego, California, on a business plan dated January 1992, which is currently being circulated among potential venture capital investors and perhaps others. This business plan includes several pages constituting the 'Firm Resume' of Gary D. Aronson Consulting. We believe that several statements and claims by Mr. Aronson, listed as the President of DepoTech Corporation, are false and misleading.

"Specifically, the statements that 'GDAC has helped establish and/or finance Vertex Pharmaceuticals' and 'GenPharm International' are untrue and misleading statements contained in the business plan. Mr. Aronson played no role in either the founding or the financing of Vertex or Gen-Pharm. These statements reflect adversely on Mr. Kinsella, who did in fact play a major role in both.

"Such statements violate California Business and Professions Code Sections 17500 et seq. relating to deceptive, untrue or misleading advertising constituting unfair competition. On behalf of Mr. Kinsella, we demand that within 10 business days you contact everyone who received the DepoTech Corporation Business Plan dated January 1992, ascertain from them the names of everyone who read the Plan, and send to each one of them a certified letter renouncing the false and misleading claims. We also demand that you provide us with a list of all persons contacted within 15 business days.

"If you do not comply, we will be forced to consider appropriate legal action."

Shortly after this letter was sent, Kinsella's attorney, Flores, spoke with Craig Andrews, DepoTech's attorney, while both were attending a legal function. Andrews told Flores that the objected-to statements would no longer be circulated and Aronson was no longer with DepoTech. Andrews asked Flores if he thought Kinsella would sue. Flores said that in light of what Andrews had stated, Kinsella probably would not sue.

On November 5, 1992, DepoTech and Aronson entered into an agreement where Aronson agreed "to indemnify (but not defend) DepoTech and its affiliates from any liability established by judgment, or arising from any claims made by Kevin Kinsella based on [his] alleged fraud or deception" and DepoTech agreed to "waive any bond requirement for a derivative suit arising from any legal action involving Kevin Kinsella" and agreed DepoTech and Aronson would split "any proceeds received from settlement, arbitration, or judgment received in any derivative suit (to be financed solely by [Aronson]) arising from claims by Kevin Kinsella."

On November 9, 1992, Andrews sent a letter to Kinsella's attorney stating Aronson was no longer employed by DepoTech, DepoTech had revised its materials to delete any references to Aronson's background or the Vertex or GenPharm International claims and that "[p]arties interested in DepoTech have already been informed as to Mr. Aronson's status with the Company." Kinsella felt this sufficiently complied with his demands and there was no need to proceed with a lawsuit "against DepoTech to stop an action that was no longer occurring."

In March through June 1993, Aronson wrote a series of letters to Kinsella's attorney. Aronson included a copy of his resume. He asserted the resume was correct but sought Kinsella's approval. He stated he needed "to use this resume to seek work but [he had] not broadly distributed it to potential

employers for fear that Mr. Kinsella [would] sue [him] as he threatened to do to DepoTech."

In June 1993, Aronson filed a libel per se action against Kinsella based on Kinsella's allegedly false statements in the October 26, 1992 letter that Aronson "played no role in either the founding or the financing of Vertex or GenPharm." Aronson alleged as a result of these statements he had suffered damage to his reputation.

In March 1994, Aronson moved for summary adjudication on Kinsella's affirmative defense that the statements were true and on the ground the October 26 letter was libelous per se. The court denied the motion. In its order, the court noted the prior action between Avalon and Aronson did not have an identity of issues with the present action because the prior action involved the value of Aronson's services, not the nature of those services.

Thereafter, Kinsella moved for summary judgment, inter alia, based on the grounds the statements in the October 26 letter were absolutely privileged under section 47, subdivision (b), and Aronson had not suffered any damages and was not entitled to presumed damages because undisputed evidence established Aronson's resume included falsehoods.

The court granted Kinsella's motion for summary judgment on the basis the statements in the October 26 letter were absolutely privileged under section 47, subdivision (b). The court denied summary judgment on the other grounds, inter alia, noting there were triable issues of fact as to damages.

DISCUSSION

I

*Litigation Privilege*

Aronson contends the court applied the wrong standard in granting summary judgment because the trial court granted summary judgment on the basis Kinsella's statements in the October 26 letter were "*absolutely* privileged under Civil Code § 47(b)" (italics added). Aronson contends the statements here were not entitled to an "absolute" but only a limited, "qualified" privilege. He argues the litigation privilege applies to statements made before litigation only when those statements are related " 'to a proceeding that is contemplated in *good faith* and under *serious consideration*' " and is "contemplated for *legitimate purposes*." (Italics as supplied by Aronson, quoting from *Herzog* v. *"A" Company, Inc.* (1982) 138 Cal.App.3d 656,

662 and fn. 5 [188 Cal.Rptr. 155].) Aronson argues because the privilege is "qualified," the privilege is defeated upon a showing of malice and he presented triable issues of fact on the malice issue.

■ Section 47, subdivision (b) provides "[a] privileged publication or broadcast is one made . . . [¶] . . . [i]n any . . . judicial proceeding . . . ."

The privilege applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. [Citations.]" (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365].)

The purpose of the litigation privilege is to afford litigants and witnesses "the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]" (*Silberg* v. *Anderson, supra,* 50 Cal.3d 205, 213.) "In other words, the litigation privilege is intended to encourage parties to feel free to exercise their fundamental right of resort to the courts for assistance in the resolution of their disputes, without being chilled from exercising this right by the fear that they may subsequently be sued in a derivative tort action arising out of something said or done in the context of the litigation. [Citation.]" (*Edwards* v. *Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 29 [61 Cal.Rptr.2d 518].)

The privilege also extends to communications which have some relation to an anticipated lawsuit. (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1194 [17 Cal.Rptr.2d 828, 847 P.2d 1044].) In California, the courts have held a prelitigation statement is protected by the litigation privilege of section 47, subdivision (b) when the statement is made in connection with a proposed litigation that is "contemplated in good faith and under serious consideration. [Citation.]" (*Edwards* v. *Centex Real Estate Corp., supra,* 53 Cal.App.4th 15, 33; *Laffer* v. *Levinson, Miller, Jacobs & Phillips* (1995) 34 Cal.App.4th 117, 123-124 [40 Cal.Rptr.2d 233] and cases cited therein; *Fuhrman* v. *California Satellite Systems* (1986) 179 Cal.App.3d 408, 421 [231 Cal.Rptr. 113], disapproved on different grounds in *Silberg* v. *Anderson, supra,* 50 Cal.3d 205, 217; *Herzog* v. *"A" Company, Inc., supra,* 138 Cal.App.3d 656, 661-662; see also *Rubin* v. *Green, supra,* 4 Cal.4th 1187, 1194-1195 [citing with approval *Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 393 [182 Cal.Rptr. 438] for the proposition that the litigation "privilege applies to communications with 'some relation to a proceeding that is actually contemplated in good faith and under serious consideration by . . . a possible party to the proceeding' "].)

This "good faith and serious consideration" test derives from section 586, comment e, of the Restatement Second of Torts. Section 586 provides: "An

attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding."[4]

Comment e to section 586 of the Restatement Second of Torts provides: "As to communications preliminary to a proposed judicial proceeding the rule stated in this Section [i.e., the litigation privilege] applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered."

 To support his argument that the privilege for prelitigation statements is only a "qualified" privilege, Aronson relies on the following language in *Laffer* v. *Levinson, Miller, Jacobs & Phillips, supra*, 34 Cal.App.4th 117, 124: "Thus, the privilege relating to statements regarding prospective litigation *is qualified rather than absolute*; the prospective litigation must be contemplated in good faith and under serious consideration. [Citations.] 'No public policy supports extending a privilege to persons who attempt to profit from hollow threats of litigation.' [Citation.]" (Italics added.)

The *Laffer* court reversed a grant of summary judgment because it had been "based solely on the absolute privilege." (*Laffer* v. *Levinson, Miller, Jacobs & Phillips, supra*, 34 Cal.App.4th 117, 124.)

From this language in *Laffer*, Aronson argues the privilege for prelitigation statements is a "qualified" rather than "absolute" privilege which can be defeated by a showing of malice. Aronson argues since there are triable issues of fact as to whether Kinsella was acting with malice when he made the statement in the October 26 letter, summary judgment was improperly granted.

 It has been stated that " 'The distinction between absolute and qualified privileges is essentially that an absolute privilege confers immunity regardless of motive while a qualified privilege can be lost if the defendant acted out of malice.' " (*Lundquist* v. *Reusser* (1994) 7 Cal.4th 1193, 1206, fn. 12 [31 Cal.Rptr.2d 776, 875 P.2d 1279].) Malice in this context means " ' "a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person." ' . . ." (*Id.* at p. 1204, citations omitted.)

---

[4]Section 587 of the Restatement Second of Torts states a similar rule for a party to litigation.

■ Our review of *Laffer* and cases applying the litigation privilege to prelitigation statements leads us to the conclusion *Laffer* used the word "qualified" in a colloquial sense and did not use the term in its technical, legal sense of meaning the privilege does not apply unless the statements were made without malice. In the *Laffer* case, Laffer, Jacobs and the respondent,[5] who were defendants in a prior action, settled with the plaintiff by each contributing money to the plaintiff. Jacobs and respondent signed mutual releases which released each other not only from any and all claims for indemnity in connection with the action but also waived the protection of section 1542, i.e., waived later-discovered claims.[6]

Laffer cross-complained against Jacobs for contribution and indemnity. Laffer and Jacobs negotiated a settlement where Jacobs agreed to pay a substantial sum to Laffer. The respondent, learning of these negotiations, wrote to Jacobs stating he was upset because in the prior action, Jacobs had represented he had no money and could only contribute a nominal amount. The respondent demanded Jacobs pay him $10,000 and if Jacobs failed to pay, then Jacobs would leave respondent " 'with no choice but to pursue legal action against [Jacobs] based upon fraud and misrepresentation in connection with the original settlement . . . .' " (*Laffer* v. *Levinson, Miller, Jacobs & Phillips*, *supra*, 34 Cal.App.4th 117, 121.) This amount demanded from Jacobs was later reduced in another letter but the threat to litigate remained. As a result of respondent's letter, Laffer alleged, Jacobs broke off settlement negotiations and Laffer suffered damages.

In reversing the summary judgment, the *Laffer* court stated: "There are triable issues of fact as to respondents' good faith serious contemplation of future litigation. [Citation.] One factor supporting a contrary inference is respondents' subsequent failure to file the threatened action. [Citations.] Another factor raising a doubt whether respondents in good faith seriously contemplated litigation is the strong language of their release in the prior action, releasing Jacobs from any and all claims for indemnity in connection with the [prior] action and waiving the protection of Civil Code section 1542." (*Laffer* v. *Levinson, Miller, Jacobs & Phillips*, *supra*, 34 Cal.App.4th 117, 124-125.)

This language indicates the *Laffer* court was not reversing on the basis there were disputed issues as to whether the statements were motivated by

---

[5]Laffer sued not only the respondent but respondent's attorney who drafted the letter with the allegedly defamatory statements. We refer here only to the individual involved in the prior action and not his attorney.

[6]Section 1542 provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

malice but on the basis there were disputed issues of fact as to whether the respondent had any good faith basis for believing he had a legitimate legal claim against Jacobs and was seriously contemplating litigation. The *Laffer* court, despite its statement the privilege for prelitigation statements was "qualified," did not, in fact, hold the privilege was "qualified" in the technical legal sense of applying only to statements made without malice. *Laffer* is thus not authority for the proposition prelitigation statements are entitled only to a qualified rather than absolute privilege.

We further note Aronson's interpretation of the "good faith and serious consideration" test would essentially resurrect the "interest of justice" test which was repudiated by the Supreme Court in *Silberg* v. *Anderson, supra*, 50 Cal.3d 205. Before the *Silberg* decision, there were a number of cases which limited the application of the litigation privilege to statements which were made in the "interest of justice." (*Id.* at pp. 216-217.) This "interest of justice" test apparently originated in *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 826 [106 Cal.Rptr. 718] where the court stated: "[I]n determining whether or not the defamatory publication should be accorded an absolute privilege, *special emphasis must be laid on the requirement that it be made in furtherance of the litigation and to promote the interest of justice.* Only if this requirement has been satisfied, is it appropriate for the courts to define liberally the scope of the term 'judicial proceeding' and the persons who should be regarded as litigants or other participants." (Original italics.)

The Supreme Court in *Silberg* disapproved of the "interest of justice" test created in *Bradley*, explaining: "We conclude that the well-intentioned addition of the 'interest of justice' test must be rejected. A rule that an otherwise privileged communication is not privileged under section 47(2) unless made for the purpose of promoting the 'interest of justice' is wholly inconsistent with the numerous cases in which fraudulent communications or perjured testimony have nevertheless been held privileged. [Citations.] Obviously, such a test would also be contrary to the decisions in which liability for abuse of process is held precluded by the privilege. [Citations.] One of the two necessary elements of that tort is an ulterior purpose. [Citation.] Finally, endorsement of the 'interest of justice' requirement would be tantamount to the exclusion of *all* tortious publications from the privilege, because tortious conduct is invariably inimical to the 'interest of justice.' Thus, the exception would subsume the rule." (*Silberg* v. *Anderson, supra*, 50 Cal.3d 205, 218.)

Among the cases *Silberg* disapproved of for relying on the interests of justice test was *Fuhrman* v. *California Satellite Systems, supra*, 179

Cal.App.3d 408, 421, a case which had involved prelitigation statements and also had applied the good faith and serious consideration of litigation test. The Supreme Court observed "in many of the decisions purporting to utilize the 'interest of justice' test [including the *Fuhrman* case], the court could have reached the same result, no privilege, on the basis of the absence of one of the traditionally recognized factors." (*Silberg* v. *Anderson, supra,* 50 Cal.3d 205, 217.) Specifically, as to the *Fuhrman* case, the Supreme Court noted *Fuhrman*'s result would have been the same without the interest of justice test because a "factual question existed as to whether the potential lawsuit was actually contemplated." (*Id.* at p. 218.) In other words, *Silberg* upheld that portion of *Fuhrman* which looked to the serious and good faith consideration of litigation test. Thus, under *Silberg* the two tests—"interest of justice" and "good faith and serious consideration"—refer to different matters.

Furthermore, Aronson's claim the privilege for prelitigation statements is qualified rather than absolute conflicts with the recent Supreme Court decision in *Rubin* v. *Green, supra,* 4 Cal.4th 1187. In *Rubin,* a mobilehome park owner sued attorneys who had solicited clients from among the renters in the mobilehome park for a suit against the park owner for defects in the park. The attorneys sent a notice they intended to sue the park owner. The park owner sued the attorneys for allegedly defamatory statements made by the attorneys while soliciting clients. The Supreme Court held these prelitigation statements were clearly within the litigation privilege of section 47, subdivision (b) and that this privilege was absolute, barring any action against the attorneys for defamation. (4 Cal.4th at pp. 1202-1203.)

We conclude the good faith, serious consideration of litigation test is not, as Aronson suggests, a test for malice and it is not a variation of the "interest of justice" test. The genesis of the test is the Restatement Second of Torts, section 586, comment e, which seeks to prevent application of the privilege when the statements are made at a time when the possibility of litigation is not seriously considered. Thus, the good faith and serious consideration of litigation test of the Restatement is addressed to the requirement the statements "have some connection or logical relation to the action. [Citations.]" (*Silberg* v. *Anderson, supra,* 50 Cal.3d 205, 212.) In other words, if the statement is made with a good faith belief in a legally viable claim and in serious contemplation of litigation, then the statement is sufficiently connected to litigation and will be protected by the litigation privilege. The privilege then applied is absolute.

In oral argument, Aronson argued the recent case of *Edwards* v. *Centex Real Estate Corp., supra,* 53 Cal.App.4th 15, 35, has added another requirement to the litigation privilege as applied to prelitigation statements, i.e., that

"the contemplated litigation must be *imminent.*" The *Edwards* court stated: "Although this element [that litigation be imminent] is not expressly stated in the Restatement, it may be inferred from the requirements that the judicial proceeding be both 'proposed' and 'under serious consideration,' and not a 'bare possibility.' (Rest.2d Torts, §§ 586-588 & com. e, pp. 247-251.) In practice, the Restatement requirement that litigation be 'seriously considered' means that an offhand suggestion a given claim or dispute *might* result in a lawsuit would be insufficient to invoke the privilege. Unless and until the parties are negotiating under the actual threat of impending litigation, the original justification for the litigation privilege of encouraging access to the courts can have no relevance to their communications." (*Edwards* v. *Centex Real Estate Corp., supra,* 53 Cal.App.4th 15, 35.)

From this language in *Edwards*, Aronson suggests that an individual seeking the protection of the litigation privilege for prelitigation statements must be ready to sue, i.e., a complaint must be in the process of being drafted or be ready to file before the litigation privilege applies. Aronson notes Kinsella never filed a complaint and because he was not allowed to inquire whether Kinsella's attorneys had drafted a complaint and upon further discovery, which should have been permitted (see pt. II, *infra*), it may be revealed that no attempt was made to draft a complaint, there may exist triable issues of fact as to whether litigation was imminent so that a grant of summary judgment was improper.

The language in *Edwards* must be viewed in the context of the case. *Edwards* involved an attempt to apply the litigation privilege to statements made by a developer and insurance company many years before the litigation was commenced. These statements were made in the course of settling with homeowners who had found cracks and rust stains in the foundations of their homes and who, in reliance on these statements, executed releases and accepted the repairs and compensation offered by the developer and insurance company. Later, after the homeowners discovered large new cracks in their foundations, learned the cracking in their foundation was due to fundamental design problems not addressed by the earlier repairs, and discovered the developer and insurance company had failed to tell them of a more thorough investigation of and repairs made to another home in the subdivision involving similar problems, the homeowners sued the developer, engineering firm and insurance company for fraud, misrepresentation, and negligence among other causes of action based on fraud in obtaining the releases. The developer and engineering firm, citing the litigation privilege, sought to exclude all the statements they had made to the homeowners before the original repairs. Thus, in *Edwards*, the court was faced with an extreme situation, where the statements were very remote in time from the

actual litigation. The "imminent" language was in response to this remoteness; to emphasize that litigation must be contemplated at the time the statements are made. The court held the litigation privilege did not apply because the statements were simply too remote from the litigation. The case does not hold or suggest that a complaint must be drafted before the privilege will apply. In short, the question in *Edwards* was not "imminentness," but remoteness. *Edwards* does not support Aronson's suggestion that a complaint must be drafted or in the process of being drafted when the statements were made. Moreover, "imminency" is not an issue in the case of a classic demand letter, such as that involved here. The very function of a demand letter is to notify the other party that litigation is imminent unless certain steps are taken. We conclude that the litigation privilege is not conditioned upon an "imminency" requirement separate from the requirement that prelitigation statements be made in serious and good faith consideration of litigation.

We conclude the court here did not err in applying an absolute, rather than qualified, privilege standard to the statements made in this case.

## II

### *Discovery*

Aronson contends the court improperly restricted his examination of Kinsella and his attorneys on what legal theories were discussed with Kinsella and what work was actually performed toward filing a lawsuit. Aronson asserts that by raising the litigation privilege as a defense, Kinsella waived the attorney-client and work product privilege.

When Kinsella raised the litigation privilege in his motion for summary judgment and attached declarations by his attorneys, Aronson sought to depose the attorneys. Kinsella opposed discovery and sought a protective order from the court based on the attorney-client and work product privileges. The court ruled Aronson was entitled to inquire into Kinsella's state of mind as to whether he intended to file a lawsuit, the attorneys' advice to Kinsella as to whether Kinsella had a legitimate legal claim, and to inquire about the meeting between Kinsella's attorney, Flores, and DepoTech's attorney, Andrews, but Aronson was not entitled to inquire into what work was actually done toward filing a lawsuit, to matters occurring after the October 26 letter was sent (except the Flores/Andrews discussion) or whether Kinsella had malice (e.g., anger or "bad intent") toward Aronson because malice was irrelevant. Following the depositions, Aronson moved for an order to compel further answers about the legal advice and theories

discussed by Kinsella and his attorneys, the amount of legal and factual research conducted by the attorneys and discussions as to the amount of damages Kinsella suffered. The court denied the motion.

These rulings by the court were proper. Kinsella, by raising the litigation privilege, did not waive either the attorney-client privilege or the work product privilege. The thoughts, conduct or work product of his attorneys was not at issue; what was at issue was Kinsella's state of mind. (Contrast *Merritt* v. *Superior Court* (1970) 9 Cal.App.3d 721, 730 [88 Cal.Rptr. 337] [work product of attorney put in issue by claim insurance company had confused attorney by providing conflicting information of policy limits].) Aronson was entitled to discover from the attorneys whether they had, in fact, been consulted by Kinsella, whether they believed Kinsella was seriously considering litigation and whether they told Kinsella he had a valid claim since these were relevant to determining whether Kinsella's statements were made in good faith and serious consideration of litigation and thus were related to litigation. The court permitted this discovery. To the extent Aronson complains that he was not permitted to examine Kinsella and his attorneys on the legal theories they discussed, we note Aronson already had notice of Kinsella's legal theory since it was expressly stated in the October 26 letter.

We conclude the court properly issued the protective order.

### III

#### *Propriety of Summary Judgment*

■ We apply the usual standard for summary judgment to this case, i.e., we conduct a de novo examination of the record to determine whether there are any genuine issues of material fact or whether the moving party is entitled to summary judgment as a matter of law.[7] (*Lichty* v. *Sickels* (1983) 149 Cal.App.3d 696, 699 [197 Cal.Rptr. 137].) While "[s]ummary judgment is a drastic procedure, should be used with caution [citation] and should be

---

[7]Kinsella contends we should review the court's grant of summary judgment using an abuse of discretion standard of review pursuant to Code of Civil Procedure section 437c, subdivision (e) which, he asserts, "expressly confers upon the trial judge the *discretion* to credit or not to credit declarations of witnesses as to their own state of mind." (Italics by Kinsella.)

Code of Civil Procedure section 437c, subdivision (e) provides: "If a party is otherwise entitled to a summary judgment pursuant to this section, summary judgment shall not be denied on grounds of credibility or for want of cross-examination of witnesses furnishing affidavits or declarations in support of the summary judgment, except that summary judgment may be denied in the discretion of the court, where the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual . . .

granted only if there is no issue of triable fact [citations]" (*Brose* v. *Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079, 1081 [228 Cal.Rptr. 620]), it is also true "[j]ustice requires that a defendant be as much entitled to be rid of an unmeritorious lawsuit as a plaintiff is entitled to maintain a good one." (*Larsen* v. *Johannes* (1970) 7 Cal.App.3d 491, 507 [86 Cal.Rptr. 744].) "A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

■ Aronson contends the court erred in granting summary judgment because there were triable issues of fact. Aronson's contention there were triable issues of fact is premised on his conclusion the prelitigation privilege is qualified and that therefore evidence tending to show Kinsella's malice was relevant, e.g., evidence of Kinsella's hostility toward Aronson, his timing of the October 26 letter to coincide with DepoTech's funding difficulties and his attitudes about DepoTech as a company. As we have explained, the privilege is absolute and thus evidence of malice is irrelevant; the absolute privilege protects even statements which are false, fraudulent or motivated by malice. The relevant evidence in the record establishes there are no material issues of fact requiring the weighing process of a trial; Kinsella's statements are absolutely privileged pursuant to section 47, subdivision (b).

Initially, we observe the October 26 letter itself is a classic prelitigation demand letter. It was written by an attorney on a potential party's behalf to another potential party to the litigation. It set out the objectionable statements, the reasons why they were objectionable and the legal basis which would support litigation. It made specific demands and threatened legal action if the demands were not met. This classic prelitigation demand letter is precisely the type of statement that the litigation privilege is intended to protect since it represents the first step toward litigation and the purpose of the litigation privilege is to provide "the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]" (*Silberg* v. *Anderson, supra,* 50 Cal.3d 205, 213.)

Second, it is undisputed that Kinsella honestly believed he had a viable legal claim against DepoTech based on the allegedly false statements in the

---

where a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof."

This section does not apply here because the court credited Kinsella's statement; Kinsella's declaration was not the only evidence of his state of mind (e.g., there was the October 26 letter itself as well as the statements by his attorneys); and finally, Kinsella was not a person "otherwise entitled to summary judgment" since the court found he was entitled to summary judgment and granted it in his favor.

DepoTech business plan and Aronson's resume. Undisputed evidence established the letter was sent only after Kinsella had consulted three different attorneys, each of whom advised him he had a valid legal claim. The fact there had been a ruling in a prior action that Aronson was entitled to compensation from Avalon for work on the Vertex project does not raise a triable issue of fact since the prior action involved a different matter, i.e., the value of Aronson's services rather than whether Aronson helped in the financing, founding or establishment of Vertex as those terms are used in the venture capital community.

Third, undisputed evidence established that at the time the letter was sent, Kinsella was seriously contemplating litigation. Kinsella stated in a declaration and in his deposition that he was seriously considering litigation. Kinsella's attorney, Michael O'Donnell, stated Kinsella intended to sue if the matter were not resolved. Both Aronson and DepoTech understood Kinsella was seriously contemplating litigation; Aronson removed himself from DepoTech for the good of the company because it "simply could not afford a lawsuit with Kinsella" and agreed to indemnify DepoTech for any liability arising from a judgment based on Kinsella's claims of Aronson's alleged fraud and deception. Aronson also submitted his resume for Kinsella's review and explained he had not "broadly distributed it to potential employers for fear that Mr. Kinsella [would] sue [him] as he threatened to do to DepoTech." DepoTech's attorney discussed with Kinsella's attorney the potentiality of a lawsuit and steps necessary to avoid one.[8]

Fourth, the fact Kinsella did not thereafter file a complaint against Depo-Tech does not raise a triable issue of fact as to whether Kinsella made the

---

[8] Aronson contends a disputed issue of fact was raised by the exchange during the deposition of DepoTech's attorney, Craig Andrews, involving the exchange with Kinsella's attorney following the October 26 letter:

"A. That was one of the things I wanted to find out from Mr. Flores, whether in fact Mr. Kinsella was seriously considering suing DepoTech.

"Q. And what did Flores tell you?

"A. He told me to the best of my recollection, that Mr. Kinsella was not considering suing DepoTech Corporation."

Initially, we note Aronson's citation for this deposition testimony consists of his quotation of this asserted deposition testimony in a memorandum he filed in opposition to Kinsella's motion for summary judgment. A quotation in memorandum, which may or may not be accurate, is not evidence (e.g., a declaration, affidavit, document or deposition) which raises a triable issue of fact. Moreover, our review of the portion of Andrews's testimony which is part of the record on appeal indicates the quoted exchange is taken out of context. Andrews initially testified he could not remember whether Flores's statement that Kinsella was unlikely to sue was made before or after Andrews told Flores that Aronson was no longer with DepoTech. Later, in the deposition, Andrews testified it was "highly likely" that Flores told him Kinsella was not likely to sue after Andrews told him Aronson's resume was being removed from DepoTech's business plan. Flores in his deposition stated he told Andrews that Kinsella was not likely to sue once he learned that Aronson was no longer with DepoTech and that Aronson's resume would no longer be circulated as a part of DepoTech's business plan.

statements in good faith and serious contemplation of litigation. DepoTech's response to Kinsella's letter—removing Aronson as president, removing the allegedly false statements from its business plan and telling parties interested in DepoTech that Aronson was no longer with the company—substantially complied with Kinsella's demands and eliminated the primary basis for litigation, i.e., to seek an injunction prohibiting continued circulation of the allegedly false statements relating to GenPharm International and Vertex.

We conclude the court properly granted summary judgment on the basis Kinsella's statements in the October 26 letter were absolutely privileged under section 47, subdivision (b).

## IV

### *Summary Judgment Based on Aronson's Inability to Prove Damages*

Kinsella appeals the court's denial of summary judgment on the ground Aronson was "libel-proof," i.e., because undisputed evidence established that some of the statements in his resume were false therefore Aronson could not have been damaged by any of the statements Kinsella made disputing the truth of Aronson's claims as to GenPharm International and Vertex.

We need not reach this issue since we have already concluded summary judgment was properly granted on the ground Kinsella's statements in the October 26 letter were absolutely privileged under section 47, subdivision (b).

### DISPOSITION

The judgment is affirmed.

Nares, J., and Haller, J., concurred.

A petition for a rehearing was denied October 28, 1997, and the petition of appellant Gary D. Aronson for review by the Supreme Court was denied December 23, 1997.