**Edward D. YANG, et al., Plaintiffs,**

v.

**Holden H. LEE, Defendant.**

**No. CIV. PJM 01–257.**

United States District Court,
D. Maryland.

Aug. 24, 2001.

John Belcher, Esquire, Oxon Hill, MD, for Plaintiffs.

Douglas Behr, Esquire, Luther L. Hejek, Esquire, Frank J. Vitolo, Esquire, Keller & Heckman, Washington, D.C., for Defendants.

## *OPINION*

MESSITTE, District Judge.

The Court has considered Defendant's Motion to Dismiss the Entirety of Plaintiffs' Complaint or in the Alternative for Summary Judgment and will GRANT the Motion to Dismiss.[1]

### I.

Plaintiffs Edward D. Yang and Helen Bao Hong Yang have filed a five-count Complaint against Defendant Holden Lee, alleging intentional misrepresentation (Count I), breach of contract (Count II), defamation (Count III), extortion (Count IV), and intentional infliction of emotional

---

1. The Alternative Motion for Summary Judgment is therefore MOOT.

distress (Count V). The suit arises out of a prospective marriage between Lee and Plaintiffs' daughter, Janet, which never took place.

Ms. Yang and Lee began a romantic relationship in 1996 while she was living in Hong Kong and he was living in California. In February 1999, Lee traveled to Plaintiffs' home in Potomac, Maryland, to ask permission to marry their daughter. Plaintiffs consented, Ms. Yang accepted Lee's proposal, and the wedding was set for September 18, 1999. In June, Yang left her job in Hong Kong as Director of Salomon Smith Barney for Asia and moved to San Francisco to live with Lee until the wedding.

During the summer, however, Yang began to develop doubts about the relationship, questioning, in particular, Lee's sexual preference and sexual history. On September 5, 1999, Yang and Lee returned to Plaintiffs' home in Maryland, where Lee admitted that he had been and still was an active homosexual. The encounter was considerably more formal than might be supposed. During the visit, Plaintiffs presented Lee with a five-page questionnaire exploring his sexual history and actually recorded an interview with him on videotape. In exchange for truthful answers by Lee, Plaintiffs agreed not to interfere with the planned marriage if their daughter still wished to go forward with it. As part of the questionnaire, Lee indicated that he would pay a lump sum of $500,000 to be held in trust by Plaintiffs as security in the event that he violated his marital obligations to Ms. Yang. Lee signed the document and, in return, Plaintiffs agreed to support their daughter's decision to marry him. The very next day, however, Lee informed Plaintiffs that he would not fulfill his promises and the wedding was cancelled. At that point, Lee had not yet paid Plaintiffs the $500,000, but had given Ms. Yang an engagement ring. In addition, the couple shared a joint bank account totaling in excess of $400,000, the ownership of which immediately became the subject of heated dispute.

On March 31, 2000, Lee had his counsel in California, Daniel A. Conrad, Esquire, send a letter to Ms. Yang's counsel in California, with a copy to the Senior Yangs in Maryland, in which Conrad discussed possible settlement of the various unresolved matters between Lee and the Yangs. The letter included allegations that Plaintiffs had written letters to family and friends in violation of Maryland and federal criminal extortion laws.[2] On April 18, 2000, following failed settlement negotiations, Lee filed suit against Janet Yang in the Superior Court of California to recover the engagement ring and other jointly held assets. Yang filed a cross-complaint seeking, *inter alia*, reliance damages incurred as a result of leaving her employment in Hong Kong.[3] The present suit by the Senior Yangs was filed in this Court on January 30, 2001.

---

**2.** The letter stated in pertinent part: "It appears that the letters [the Yangs] have written to family and/or friends of Mr. Lee violate applicable provisions of the Maryland statutes regarding threats and extortion, including but not limited to Crimes & Punishments Article 27 §§ 561; 562; 562B; and/or applicable provisions of federal law relating to threatening communications, including but not limited to 18 USC § 876."

**3.** The California court eventually granted summary judgment in favor of Lee on his claims of conversion, imposed a constructive trust on Yang with regard to the engagement ring, and dismissed Yang's cross-complaint in its entirety. As of this writing, the remainder of Lee's claims against Yang are still pending.

## II.

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) will be granted only when it appears beyond doubt that a plaintiff can prove no set of facts that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Labram v. Havel,* 43 F.3d 918, 920 (4th Cir.1995). The court views the complaint in the light most favorable to plaintiff and considers all inferences that may be reasonably drawn from plaintiff's complaint. *See Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Finlator v. Powers,* 902 F.2d 1158, 1160 (4th Cir.1990). The court, however, is not obliged to adopt plaintiff's legal conclusions. *See District 28, United Mine Workers of America, Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1085 (4th Cir. 1979). A complaint that lacks a valid legal premise or fails to state a claim is subject to dismissal. *Id.* at 1085–86.

## III.

■ Plaintiffs' first claim is that Lee, by way of omission, intentionally misrepresented his sexual orientation and sexual history prior to asking for their consent to his marriage to their daughter. Lee argues, among other things, that this cause of action is barred as a breach of a promise to marry. The Court agrees.

The common-law cause of action for breach of promise to marry was abolished by the Maryland Legislature in 1945. *See* 1945 Md. Laws 1010 (the so-called anti-heart balm statute); *see also Miller v. Ratner,* 114 Md.App. 18, 28, 688 A.2d 976, 981 (1997). The original act and subsequent re-enactments included this statement of public policy:

The remedies heretofore provided by law for the enforcement of actions based upon alleged alienation of affections and alleged breach of promise to marry, having been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances and such remedies having been exercised by unscrupulous persons for their unjust enrichment, and such remedies having furnished vehicles for the commission or attempted commission of crime and in many cases having resulted in the perpetration of frauds, it is hereby declared as the public policy of the State that the best interests of the people of the State will be served by the abolition of such remedies.

1945 Md. Laws 1010; Md.Code art. 75C, § 1 (1951); Md.Code art. 75C, § 1 (1957). While not explicitly reiterated in later codifications, this statement of public policy has been consistently reaffirmed.[4] *See Miller,* 114 Md.App. at 28, 688 A.2d at 981. The bar to actions for breach of promise to marry is currently codified at Section 3–102 of the Family Law Article which states that "[u]nless an individual is pregnant, an individual: (1) has no cause of action for breach of promise to marry; and (2) may not bring a cause of action for breach of promise to marry regardless of where the cause of action arose." Md.Code Ann., Fam. Law § 3–102 (1999).

The *Miller* case, decided in 1997, provides a measure of just how forceful Maryland's public policy is in the matter: "[W]e would be hard pressed to find a stronger expression of a legislative entity's attitude

4. *See* Md.Code Ann., Cts. & Jud. Proc. § 5–301 (1974) ("The specific declarations of public policy are not included in this section as it is believed they are well understood and the need for repeating them is minimal; nevertheless these considerations are still relevant, and there is no intention to affect them by the repeal of §§ 1–9 [of the previous statute].")

of repugnance towards a cause of action in statutory language." *Miller*, 114 Md.App. at 30, 688 A.2d at 982.

The defendants' actions in *Miller* were grossly insensitive, to put it mildly. Lonnie Miller had moved in with her boyfriend, Warren Ratner, at his request and had substantially changed her lifestyle based upon his promises of marriage. When Miller was diagnosed with breast cancer three years after moving in, Ratner announced an end to the relationship and attempted to expel her from his home. When Miller refused to depart, Ratner began waking her up in the middle of the night admonishing her to leave, this at a time when she was undergoing radiation treatments. At the same time, his brother was telephoning Miller, calling her a "bitch," "whore," and "one-breasted woman," and telling her she was going to die. Notwithstanding the extreme behavior of Ratner and his brother and the undeniable anguish Miller endured as a result, the Court of Special Appeals found all of Miller's causes of action against the brothers barred by the anti-heart balm statute:

> We have examined closely and extensively the record forwarded to us for any indication that Ms. Miller's cause of action is based on anything other than her previous personal relationship with Warren Ratner that was, according to the averments of her complaints—made by her applicable to all counts ..., based on their "permanent commitment that would be followed by marriage" and *"promises ... [i]n anticipation of marriage."* ... We have found no indication of any other fundamental relationship between the parties or other basis for the actions filed.

114 Md.App. at 40–41, 688 A.2d at 987 (emphasis added).

*Miller*, in the Court's view, is fully dispositive of the present case. However disconcerting Janet Yang's situation may be to her and her family, it hardly approaches, much less surpasses, the plight of plaintiff in *Miller*. Since any claim by Janet Yang is foreclosed by the anti-heart balm statute, *a fortiori* any claim by her parents is also barred.[5]

Plaintiffs argue that this is not an action for breach of promise to marry because they would have had a claim for intentional misrepresentation had the marriage taken place as planned. Assuming that to be so, it is of no consequence. The Court can only decide the case that is before it and, in *this* case, the wedding never took place because Lee breached his promise to marry Janet Yang. This is thus a classic instance for application of the anti-heart balm statute, which is remedial in nature and must be construed liberally. *See id.* at 42, 688 A.2d at 988. A party may not circumvent the Legislature's intent by re-characterizing a breach of promise to marry action as a general claim in contract or as a tort. *See Gasper v. Lighthouse, Inc.*, 73 Md.App. 367, 372, 533 A.2d 1358, 1360 (1987) (discussing related abolished actions for alienation of affections and criminal conversion); *Waddell v. Briggs*, 381 A.2d 1132 (Me.1978). The fact that Plaintiffs have couched their claim as one for "intentional misrepresentation" rather than "breach of promise to marry" does not insulate it from the reach of the statute.

---

**5.** The language of the statute, it should be noted, prohibits all "individuals" from bringing a suit for breach of promise to marry. This obviously extends to third parties who attempt to file suit on behalf of the disap-pointed bride or groom. *See, e.g.,* 12 Am. Jur.2d *Breach of Promise* § 14 n. 64 (1964) (citing *Waddell v. Briggs*, 381 A.2d 1132, 1137 n. 4 (Me.1978)).

██ Lest there be any doubt, even if a claim for intentional misrepresentation existed in connection with a breach of promise to marry, it would fail in this case. When a defrauded party, with full knowledge of the fraud, intentionally waives or condones fraudulent actions, that party cannot thereafter claim damages for the fraud. *See* 37 Am.Jur.2d *Fraud and Deceit* § 322 (2001). Here the alleged misrepresentation related to Lee's sexual proclivities. Despite the fact that they were informed by Lee of his proclivities in this respect in person, in writing, and on videotape, Plaintiffs nevertheless gave their consent to his marriage to their daughter. In effect, they agreed to overlook Lee's prior alleged misrepresentations. They would therefore be estopped from asserting a claim for intentional misrepresentation in any event.

Lee's motion to dismiss the claim of intentional misrepresentation is GRANTED.

## IV.

██ Plaintiffs next claim that Lee breached his agreement to place $500,000 in trust for Janet Yang for the purposes previously discussed. They claim that the five-page handwritten questionnaire inquiring into Lee's sexual history and physical health constituted a contract that included promises that Lee would abide by once married to Yang.[6] The pertinent language of the questionnaire reads: "Given the high risk that my daughter is taking, after she quit her million dollar job to be with you, are you willing to provide a lump sum of [*left blank* ] up front as a gesture of your sincerity to provide and support Janet Yang in the future?" It is undisputed that the sum of "$500,000" was filled in by Lee. The Questionnaire goes on to state that "[t]his amount will not be use[d] by anyone. It will be held by me and my wife for the sole purpose to protect my daughter in case you break your promise in the future." It is also undisputed that Lee signed the document on the last page.

This cause of action fails for the same reason that the intentional misrepresentation count fails. It would place Lee in the identical situation the anti-heart balm statute was designed to avoid—either to go through with a marriage he did not wish to pursue or pay a very substantial sum to break the engagement. The anti-heart balm statute stands as an absolute bar against such a Hobson's Choice.

Again, the fact that this contract might arguably have been enforceable if the marriage had gone forward as planned is of no consequence. In *this* case, Plaintiffs argue that Lee breached the contract by failing to pay the $500,000 that became due under the contract when he failed to "provide and support Janet Yang in the future." Inevitably, what they are asserting is that money is payable to them because Lee breached his agreement to marry their daughter, a barred cause of action.[7]

Lee's motion to dismiss the breach of contract claim is GRANTED.

## V.

██ Plaintiffs next claim that Lee, through his attorney in California, de-

---

**6.** The questionnaire attached to Lee's motion is properly considered in a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) inasmuch as it is the contract upon which Plaintiffs base their claim and is thus intrinsic to the pleadings. *See Homart Dev. Co. v. Sigman,* 868 F.2d 1556, 1562 (11th Cir.1989).

**7.** This is but one of several promises in the questionnaire made in anticipation of marriage. For example, Lee also promised to be faithful after marriage and provide information to Yang to prove his continuing fidelity.

famed them in the March 31, 2000 letter published to Janet Yang's attorney in California, when he accused them of serious criminal offenses. Apart from the problems associated with holding a client vicariously liable for defamation engaged in by his attorney,[8] this claim must also fail. The letter in question reads in pertinent part:

> It appears that the letters [the Yangs] have written to family and/or friends of Mr. Lee violate applicable provisions of the Maryland statutes regarding threats and extortion, including but not limited to Crimes & Punishment Article 27 §§ 561; 562; 562B; and/or applicable provisions of federal law relating to threatening communications, including but not limited to 18 USC § 876.[9]

Lee contends that this cause of action is barred by reason of the doctrine of judicial privilege. The Court agrees.

 The Court notes at the outset that California law controls. Maryland applies the rule of *lex loci delicti* in tort cases, that is, the law of the state where the harm occurred. *See Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir.1999). In defamation actions, the location of the harm is the place where the defamatory statements were published to third parties. *See id.* at 522; *see also Abadian v. Lee*, 117 F.Supp.2d 481, 485 (D.Md.2000). Since California was the only place of alleged publication in this case, the Court looks to its substantive law of defamation as well the defenses to such actions.

 In California, "litigation privilege" is established by statute. *See* Cal. Civ.Code § 47 (West Supp.2000). It applies to:

> any communication (1) made in a judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.

*Silberg v. Anderson*, 50 Cal.3d 205, 266 Cal.Rptr. 638, 786 P.2d 365, 369 (1990). The purpose of the privilege is to afford litigants the "utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Id.; see also Lerette v. Dean Witter Org., Inc.*, 60 Cal.App.3d 573, 131 Cal.Rptr. 592, 594 (1976). The privilege is deemed to promote the effectiveness of judicial proceedings by opening the channels of communication without the external threat of liability. *See Silberg*, 266 Cal.Rptr. 638, 786 P.2d at 369. To achieve its purposes, the privilege is established as absolute. *See id.* at 370.

More on point in the present case, California has not restricted the litigation privilege to statements made during trial or even during pre-trial procedures since an attorney has an ethical duty to communicate promptly with an adversary, put forth

---

8. *See Demopolis v. Peoples Nat'l Bank of Washington*, 59 Wash.App. 105, 796 P.2d 426, 434 (1990) ("[A] client's liability for his or her attorney's defamatory communications [is limited] to situations in which the attorney acted within the scope of employment, and with the client's knowledge and consent."); *see also Lynn v. Superior Court*, 180 Cal. App.3d 346, 225 Cal.Rptr. 427, 428 (1986) (stating that a client is insulated from tort liability for his attorney's litigation conduct where "[t]here is no showing . . . of ratifica-

tion or any other act by [the client] endorsing or approving of attorney's actions.")

9. The March 31 letter may properly be considered in a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) because Plaintiffs here referred to the letter in their Complaint, and it is central to their claim. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384–85 (10th Cir.1997) (consideration of letter that was repeatedly referenced in the complaint in support of plaintiff's claims did not convert motion).

his client's claims, pursue settlement, and warn of possible judicial action. *See Lerette*, 131 Cal.Rptr. at 594–95. Accordingly, California courts have adopted the view of the Restatement (Second) of Torts that the privilege extends to relevant communications made prior to an *anticipated* judicial proceeding. *See id.; Restatement (Second) of Torts* § 586 (1977).[10] Such statements, however, must be made "with a good faith belief in a legally viable claim and in serious contemplation of litigation." *See Aronson v. Kinsella*, 58 Cal.App.4th 254, 68 Cal.Rptr.2d 305, 313 (1997).[11]

Plaintiffs argue that the statements made by Lee's California counsel in the March 31, 2000 letter are not protected by judicial privilege because they were not made in "good faith." The proof of this, they argue, is that the letter *falsely* accuses them of criminal offenses. The Court, however, finds Plaintiffs' focus on the falsity of the accusations to be misplaced. The "good faith test" does not require that the challenged statements ultimately be found to be true, only that the speaker hold a reasonable belief in the validity of the claims and that litigation be seriously contemplated.

Lee's counsel obviously felt that Plaintiffs were threatening Lee and trying to extort money from him because indisputably, believing they were in the right, Plaintiffs were threatening him and trying to have him pay them money. Lee's counsel was acting with no less passion in the defense of what he took to be Lee's rights than Plaintiffs were in what they took to be the pursuit of their own rights. As it happens, and as this Opinion points out, there was and is no legal basis for Plaintiffs to have insisted that Lee make any payments to them. Nevertheless, directly or indirectly, they pursued their demands for payment. Suffice it to say that Lee's counsel could fairly, even if inaccurately, entertain a belief in the validity of Lee's civil claims against Plaintiffs as well as the possible applicability of criminal proceedings against Plaintiffs based on their demands.[12]

At the same time, the letter exchanges demonstrate that the parties were clearly contemplating litigation. The March 31 letter explicitly states that:

> Mr. Lee now intends to proceed aggressively against Yang *and her parents* to collect the monies and property due to him, and to enforce his rights against Mr. and Mrs. Yang for their wrongful acts against him. If you have not previously done so, you should advise Mr. and Mrs. Yang to obtain counsel to assess

---

10. The Restatement states: "An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." *Restatement (Second) of Torts*, § 586 (1977).

11. In *Aronson*, the court explicitly refused to read this test as creating a *qualified* privilege, holding that, regardless of whether the statement is made in the course of a judicial proceeding or in contemplation of litigation, malice is simply not a relevant factor. *See* 68 Cal.Rptr.2d at 313. The court emphasized

that statements made with a good faith belief in a legally viable claim and in serious contemplation of litigation will be sufficiently connected to the litigation and *absolutely* protected by the privilege. *See id.*

12. The Court notes that in this suit Plaintiffs themselves—or at least their counsel—have not hesitated to accuse Lee of blackmail, a civil cause of action which, as the Court discusses in the following section, does not exist in Maryland. But whether it exists or not, Plaintiffs—and their counsel—are shielded by the same doctrine of judicial privilege that shields Lee in connection with his attorney's March 31, 2000 letter.

their own risk, whether to be asserted in a Maryland court or in a California court. (Emphasis added).

Given the closely-linked nature of Janet Yang's claims and those of her parents, as well as the fact that the Senior Yangs apparently did not have separate counsel, the actions of Lee's counsel in warning the Senior Yangs through their daughter's counsel were certainly not unreasonable. By sending a copy of the letter to the Senior Yangs, Lee's counsel was warning them directly that if the various claims among and between them were not settled, litigation might well follow. At the end of the day, whether sent to the Senior Yangs indirectly through their daughter or sent to them directly, the March 31, 2000 letter from Lee's counsel was nothing more than a prototypical, sabre-rattling attorney demand letter, which said in effect "either settle with us or we'll sue."

Lee's motion to dismiss Plaintiffs' claim for defamation is GRANTED.

### VI.

 Plaintiffs also claim that Lee engaged in blackmail by threatening to sue them for extortion unless they turned over money and other valuable goods. Blackmail, of course, is itself a form of extortion.[13] Maryland, however, recognizes no civil cause of action for extortion. In *Helwig v. Suburban Chevrolet, Inc.*, 33 Fair Empl. Prac. Cas. (BNA) 1261 (D.Md.1983) [Available on WESTLAW, 1983 WL 539], Judge Ramsey of this Court expressly declined to adopt such a cause of action in the absence of a Maryland statute or case law establishing one. Plaintiff in *Helwig* had argued, under the broad language of

*Wilmington Trust Co. v. Clark*, 289 Md. 313, 424 A.2d 744 (1981), that the defendant's alleged violation of the *criminal* extortion statute created a class of protected persons in whose favor a tort as well as a crime should be recognized. Plaintiff proposed, quoting *Wilmington*, that "there is no need for a tort to have a name before an action for damages can be maintained ... [as long as there exists] a legal duty owed by the defendants to the plaintiff." *See* 289 Md. at 327, 424 A.2d at 753. Judge Ramsey flatly rejected this reasoning:

> The extortion claim advocated by plaintiff is a question with such potential impact upon tort law and damage remedies within the State, that it should be adopted only by the State courts or the legislature of the State of Maryland. It would be inappropriate for this Court to fashion such an interpretation of Maryland law, since no State body has chosen to take action.

*Helwig*, 33 Fair Empl. Prac. Cas. (BNA) 1261.

Plaintiffs in the present case argue that they should be permitted to pursue their claim based on the very same reasoning Judge Ramsey rejected in *Helwig*, *i.e.*, that because they fall within the class of persons the criminal extortion statutes are designed to protect, they should be able to bring a civil cause of action. The Court, however, sees no reason to depart from Judge Ramsey's rationale in *Helwig*. Unless and until the Maryland Legislature or its appellate courts hold otherwise, the Court finds no basis for recognizing a civil cause of action for extortion in this State.[14]

---

13. "Blackmail" is defined as an "unlawful demand of money or property under threat to do bodily harm, to injure property, to accuse of crime, or to expose disgraceful defects. This crime is commonly included under extortion or criminal coercion statutes." *Black's Law Dictionary* 170 (6th ed.1990).

14. Even if there were a civil cause of action for extortion in Maryland, most if not all of

## VII.

█ Finally, Plaintiffs claim intentional infliction of emotional distress based on the March 31 letter and all of Lee's conduct resulting in the broken engagement between him and their daughter. The Court's earlier analysis disposes of this claim.

Any claims arising out of the March 31, 2000 letter are barred by judicial privilege. While the statute creating the privilege was initially enacted in reference to defamation claims, California courts have since held that it immunizes defendants from a variety of tort actions, including claims for intentional infliction of emotional distress. *See Silberg,* 266 Cal.Rptr. 638, 786 P.2d at 371; *Lerette,* 60 Cal.App.3d 573, 131 Cal. Rptr. 592. Lee, consequently, is immunized in the present case.

█ At the same time, any distress on Plaintiffs' part flowing from the "former relationship and broken engagement [between Lee and Janet Yang]" is non-compensable by reason of Maryland's anti-heart balm statute. As with Plaintiffs' other claims, the essence of this claim remains Lee's breach of a promise to marry their daughter. However anguished Plaintiffs may feel as a result of this undeniably sorry episode in their lives and the life of their daughter, Maryland as well as a number of other states, for better or for worse, have abolished all actions related to breaches of promises to marry.[15] No court remedies are available to ease the pain or embarrassment of affairs such as the present one. The case, therefore, is at an end.

The Court will GRANT Defendant's Motion to Dismiss in its entirety. A separate Order will be entered implementing this decision.

Plaintiffs' claim would still be barred by judicial privilege.

## FINAL ORDER

Upon consideration of Defendant Holden H. Lee's Motion to Dismiss (Paper # 9) and Plaintiffs Edward D. Yang and Helen Bao Hong Yang's Opposition thereto, for the reasons set forth in the accompanying Opinion, it is, this 24 day of August, 2001,

ORDERED:

1. Defendant's Motion to Dismiss is GRANTED;

2. Defendant's Motion for Summary Judgment is MOOT; and

3. The Clerk of the Court shall CLOSE this case.

15. *See generally* 12 Am.Jur.2d *Breach of Promise* §§ 13–16 (1997).