*Angela Wallace v. Evert R. Hawk, II*, No. 230, Sept. Term, 2024. Opinion by Tang, J.

**MARRIAGE AND COHABITATION – PARTICULAR CASES AND AGREEMENTS – RIGHT OF ACTION – EFFECT OF STATUTE**

Family Law § 3-102, commonly referred to as Maryland's "heart balm" statute, precludes the cause of action for breach of a promise to marry.

The plaintiff sued the defendant for fraud and breach of fiduciary duty. She claimed that the defendant made misrepresentations that they were in a long-term monogamous relationship, he wanted to buy a home together, and combine families. He further represented that he would contribute half of the down payment for the house and share household expenses. The plaintiff claimed that these misrepresentations induced her to purchase the house, which allowed the defendant to serve as her real estate agent and financially benefit by earning a commission on the transaction. At trial, the trial court granted the defendant's motion for judgment on the basis that these claims were barred by the statute and dismissed the claims.

The trial court erred in granting the defendant's motion for judgment on the plaintiff's claims of fraud and breach of fiduciary duty because the real basis of the plaintiff's claims was not that the defendant wronged her by not marrying her. Instead, her claims were rooted in the defendant's deception about the nature of their relationship and his financial commitments to share in the costs of the property she purchased.

**UNJUST ENRICHMENT AND CONSTRUCTIVE CONTRACTS – NATURE AND GROUNDS OF LIABILITY – IN GENERAL – NATURE AND ELEMENTS OF PARTICULAR THEORIES, CLAIMS, OR CAUSES OF ACTION – RESTITUTION AND DISGORGEMENT**

**UNJUST ENRICHMENT AND CONSTRUCTIVE CONTRACTS – MEASURE AND AMOUNT OF RECOVERY**

To sustain a claim based upon unjust enrichment, the plaintiff must establish: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. Under the first element, it is not required that a benefit conferred in an unjust enrichment action come directly to the defendant from the plaintiff's own resources. The first element of unjust enrichment may be satisfied even though the benefit conferred consisted of funds paid by another that were not the plaintiff's.

Unjust enrichment is concerned with the receipt of benefits that should not, in equity, be retained by the recipient. The intent of such a claim is not to compensate a plaintiff for damages, but rather, to disgorge profits from a defendant who is not entitled to keep them. A defendant's fraud or breach of fiduciary duty, even if it did not result in the appropriation of the plaintiff's property, may still entitle the plaintiff to restitution.

The circuit court erred in granting summary judgment as to the plaintiff's unjust enrichment claim. The court appeared to reason that since the funds used to pay the defendant's commission did not belong to the plaintiff, she would not be entitled to restitution. However, the fact that a third party paid the defendant the commission does not defeat the unjust enrichment claim. If the jury determines that the defendant was unjustly enriched, they could award the plaintiff damages equal to the amount of the commission, even if she did not suffer any economic loss.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 230

September Term, 2024

_____

ANGELA WALLACE

v.

EVERT R. HAWK, II

_____

Beachley,
Tang,
Battaglia, Lynne A.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Tang, J.

_____

Filed: December 18, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Nearly eighty years ago, the Maryland General Assembly largely abolished the cause of action for breach of promise to marry. The statute abolishing the cause of action is now codified in Maryland Code Ann., Family Law ("FL") § 3-102(a):

> Unless the individual is pregnant, an individual: (1) has no cause of action for breach of promise to marry; and (2) may not bring an action for breach of promise to marry regardless of where the cause of action arose.

Since the abolishment of this action, there have only been two reported cases in Maryland that have addressed the scope of this statute: *Miller v. Ratner*, 114 Md. App. 18 (1997), and *Bradley v. Bradley*, 208 Md. App. 249 (2012). In this case, we again examine the limits of the statute's application.

Appellant Angela Wallace ("Angela") filed a lawsuit in the Circuit Court for Anne Arundel County against appellee Evert Hawk, II ("Evert"),[1] in which she asserted three counts at issue in this appeal: fraud, breach of fiduciary duty, and unjust enrichment. The court granted summary judgment in Evert's favor on the unjust enrichment claim for reasons unrelated to the statute. The case proceeded to a jury trial on the claims of fraud and breach of fiduciary duty. Upon Evert's motion for judgment after Angela's case, the court dismissed these claims on the basis that they were barred by FL § 3-102.

On appeal, Angela presents three questions for our review, which we consolidate into two:[2]

---

[1] For clarity, this Opinion will refer to the parties and other individuals by their first names. No disrespect is intended.

[2] The issues presented in Angela's brief are:

I. Did the court err in granting the motion for judgment on Angela's claims for fraud and breach of fiduciary duty?

II. Did the court err in granting the motion for summary judgment on Angela's claim for unjust enrichment?

We answer both questions in the affirmative and accordingly vacate the judgments of the circuit court.

## BACKGROUND

Angela and Evert both worked for the Department of Defense and began dating in January 2016. At that time, Angela and her son resided in an apartment in Odenton, Maryland. Evert, who also had a child, informed Angela that he was living in a house in Arnold, Maryland. Eventually, he moved out of this house and told Angela that he was living in Fort Meade, Maryland.

---

I. Whether Md. Family Law Code § 3-102 properly barred [Angela's] fraud and breach of fiduciary duty claims at trial[.]

II. Whether Md. Family Law Code § 3-102, as applied by [the circuit court] in this case, is inconsistent with Article 19 of the Maryland Declaration of Rights and therefore unconstitutional as applied in this case[.]

III. Whether [the circuit court] properly granted summary judgment on [Angela's] unjust enrichment claims in Count V prior to trial.

In her second question presented, Angela raises a constitutional challenge in support of her first question presented. She argues that FL § 3-102, as applied by the circuit court, violated her right to pursue legal remedies for the injuries she sustained, as guaranteed by Article 19 of the Maryland Declaration of Rights. Because we resolve the first question on a non-constitutional ground, we need not address the constitutional argument presented in the second question. *See State v. Lancaster*, 332 Md. 385, 403 n.13 (1993) (explaining the principle that an appellate court "will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground").

2

On April 7, 2016, Evert took Angela to his vacant home in Arnold. According to Angela, Evert told her that he "wanted an exclusive dating relationship" with her and "wanted to get assurances" from her that they "were going to be exclusive." During the drive back from Arnold, Evert "mentioned that he wanted to look for a home, combine households, and have a home for four," referring to Evert, Angela, and their respective children. He felt like Angela "was the one for him" and that they should "combine households." She understood that there was an agreement to "eventually" marry based on discussions that day.

On April 29, 2016, Angela wrote to her cousin about this development. She explained that she and Evert "talked about the living situation last night. We're going to get a house and move in together and then figure out when to get married after that."

At some point, Evert told Angela that because he had his real estate license, he could help find a home in a good location for their combined family. He also told her that he would waive his commission.

According to Angela, the two agreed to "contribute equally on the 20 percent down payment and that it would be a jointly shared purchased home[,] sharing expenses 50/50." They also agreed that "the mortgage, the homeowners['] fees, and all the utilities would be split between the two of [them]."

On October 31, 2016, Angela signed an exclusive buyer representation agreement with Taylor Properties, her broker, and Evert, her real estate agent.

3

**Angela's House Purchase**

Evert and Angela looked at many properties before finally agreeing to purchase a house on Brownstone Drive in Severna Park, Maryland. Angela signed the residential sales contract as the sole buyer. She made an initial deposit and paid the down payment of $115,958.25, which she funded using an inheritance she received.

Angela took possession of the home on July 28, 2017. However, Evert did not move in right away. He explained that he was occupied with War College and studying, stating that he "had a lot on his plate."[3] Meanwhile, Angela covered the entire mortgage payments and the costs for home repairs.

By March 2018, Evert had still not moved in. Angela expressed her concern to him about the financial burden of supporting the home: "We agreed to buy the home together, which to me meant sharing the expenses from day one and we're headed into month nine and it's all been on me."

Eventually, Evert moved in on May 2, 2018. On May 25 and June 1, he paid Angela $1,328.41, which represented half the monthly mortgage payment and half the monthly HOA fees. They agreed that due to his military deployment in May and his attendance at War College in June, he would start sharing the utilities costs with Angela beginning in July. Evert continued to pay $1,328.41 per month, along with half of the utility bills. However, he never paid Angela his agreed-upon half of the down payment for the house.

---

[3] Evert attended the Army War College between 2017 and 2019. He attended mostly by correspondence, though some parts were in person.

According to Angela, she and Evert were planning a wedding set for December 2018. At the end of September, the two planned to visit a jewelry store to look at stone shapes for Angela's engagement ring. Angela proceeded to purchase a wedding dress along with accessories. However, Evert did not buy an engagement ring, and ultimately, the wedding did not take place in December.

By April 26, 2019, Evert had still not purchased an engagement ring. The two were scheduled to have engagement photos taken the next day. On the morning of April 27, Angela took her son to swimming lessons. Soon after arriving there, she began receiving notifications on her phone from her home security cameras indicating movement in the driveway. She played the video recording and could hear Evert speaking to another woman on the phone. Based on what she heard in the recording, it became clear that Evert had been dating another woman. As a result, Angela ended the relationship with Evert and asked him to move out.

### Angela Discovers Evert's Other Relationships

In May 2019, Angela's work colleague introduced her to Kimberly Gauthier ("Kim"), who had also dated Evert. Angela learned from Kim that Evert had been in a romantic relationship with her that overlapped with his and Angela's relationship by about two and a half or three years. Evert had lived with Kim in her home on Crosslanes Way in Odenton for some time. According to Kim, they had also discussed marriage, combining families, and buying a house together. Like Angela, Kim believed that she and Evert were in an exclusive, monogamous relationship.

At one point, Evert suggested to Kim that since they were combining households, it would be more practical to purchase a home first and then move out of the Crosslanes home once they moved into the new property. Initially, they found a property, put in a joint contract, and secured preapproval for a joint mortgage loan. The contract was amended to indicate that Evert, who would act as Kim's real estate agent, would waive his commission. However, the purchase never materialized, and they continued looking for other properties.

On May 7, 2017, Kim signed a contract to purchase a home on Harlequin Lane in Severna Park. Evert told Kim that the contract had to be under her name because he was unable to qualify for a mortgage. They agreed that he would contribute between $200,000 and $300,000 for furniture and renovations, and he would pay $1,500 per month towards the mortgage payments.

On June 27, 2017, Kim closed on the Harlequin house. Evert earned a commission of $24,375 from this sale. In addition, he acted as Kim's agent in selling the Crosslanes home, for which he earned a $16,500 commission that he agreed to pay her. However, he never gave Kim that commission.

Evert moved into the Harlequin home with Kim. According to Kim, the relationship later soured based on a confluence of issues, including Evert's refusal to contribute to the new home and suspicions of infidelity. Evert moved out the first week of May 2018, after which he moved in with Angela at the Brownstone house.

Angela discovered that Evert had been in romantic and sexual relationships with other women at various times during what Angela believed was a monogamous relationship with him. Angela also learned that, despite Evert's representation that he would not receive

6

a commission on her purchase of the Brownstone home, he actually did receive $13,253.25, which the sellers paid.

## Angela's Complaint Against Evert

Angela filed a complaint against Evert alleging fraud, breach of fiduciary duty, and unjust enrichment.[4] The allegations that served as a basis for each count have been summarized above.

Regarding the fraud count, Angela alleged that Evert made numerous false representations to her with the intent to defraud her. She alleged that these statements included the following:

> [T]hat [Evert] "loved" [her] and that [they] were in a committed, long-term monogamous relationship; (2) that [he] would pay [her] half of the 20% down-payment and closing costs or $57,000 toward the purchase of the home after filing his "amended tax return;" (3) that [he] and his daughter would live in the new home indefinitely with [Angela] and [Evert] would pay equally for renovations and household items; (4) and that [he] would waive any commission he earned as the buyer's real estate agent on the transaction to purchase the new home to save [her] money.

Angela alleged that Evert knew these representations were false and were made to induce her to proceed with the purchase of the Brownstone home so that "he could gain financially through his receipt of substantial commission payments for the real estate transaction." She further alleged that she reasonably relied on these representations when

---

[4] Angela included a fourth count against Evert for the negligent transmission of a sexually transmitted disease. Kim was also a named plaintiff in the complaint, which alleged fraud, breach of fiduciary duty, and unjust enrichment. The court granted summary judgment in Evert's favor on these claims. The grant of summary judgment as to these counts is not before us.

deciding to purchase the property, and that she would not have proceeded with the purchase had she known that these representations were false.

For the breach of fiduciary duty count, Angela alleged that Evert owed her a fiduciary duty under Maryland statutes and regulations governing real estate agents.[5] Angela alleged that he breached that duty by engaging in "his romance fraud scam" to enrich himself, by "willfully making misrepresentations," and by making "false promises" to induce her to purchase the Brownstone home.

For the unjust enrichment count, Angela alleged that during the "perpetration of his romance fraud scams," she "conferred substantial financial benefits" on him, which he knowingly accepted. In relevant part, she alleged that Evert received the benefit of the real estate commission ($13,253.25) when he served as her real estate agent.

Eventually, Angela sold the Brownstone home for $539,000 in October 2020. She received net proceeds of $116,694.17. At trial, she claimed damages from the losses she suffered for the purchase and sale of the house and expenses she paid to maintain it. She also sought restitution for the commission in the amount of $13,253.25.[6]

---

[5] In her complaint, Angela cited statutes governing the licensing of real estate agents. *See* Md. Code Ann., Bus. Occ. & Prof. § 17-322(b)(2) and (b)(3) and COMAR 09.11.02.02(A). These statutory authorities were discussed in the parties' briefs before this Court. In addition, Evert argues in his brief that Angela failed to establish the existence of an independent fiduciary duty. We need not decide issues related to the merits of the breach of fiduciary duty claim. As explained below, the issue before us is limited to whether FL § 3-102 bars the breach of fiduciary duty claim (and the fraud claim).

[6] Initially, Angela sought damages for the purchase of her wedding dress and accessories. However, she later stated at trial that she was no longer pursuing damages for these expenses.

8

## Evert's Motion for Summary Judgment

After discovery, Evert filed a motion for summary judgment on all claims. After hearing arguments, the court took the matter under advisement and entered an order summarily denying summary judgment on the fraud and breach of fiduciary duty counts, finding that material disputes of fact existed. The court granted summary judgment on the unjust enrichment claim without explanation other than stating that there was no dispute of material fact.

## Relevant Trial Testimony

Angela called various witnesses in her case, including Kim and other women who had relationships with Evert, whose relevant testimony was summarized above. In addition to what has been recounted above, Angela testified that she believed they were "in an exclusive dating relationship" and at some point, considered Evert her fiancé. She testified that she "would not have signed [the buyer representation agreement] . . . if [she] had known [that Evert] was with someone else." She testified that if she had known that Evert was living with Kim or having other sexual relationships at the time, she would not have purchased the home nor even looked for a home in the first place.

During cross-examination, Angela testified that although marriage was discussed, her decision to purchase the home was based on Evert's promises to buy the house together, which meant paying half of the down payment and sharing in the expenses of the house:

> [COUNSEL FOR EVERT:] On direct examination, you described generally the promises you believe [Evert] made to you which your claim is based. Particularly, a series of promises related to the purchase of your home, correct?

[ANGELA:] Yes, that's correct.

[COUNSEL FOR EVERT:] And . . . you made a claim that you wouldn't have purchased the home but for the promises made to you by [Evert], correct?

[ANGELA:] Yes, that's correct.

[COUNSEL FOR EVERT:] And that you couldn't really afford the home without his contribution, correct?

[ANGELA:] No, I didn't want the home.

\* \* \*

[COUNSEL FOR EVERT:] Is it your contention that there's a suggestion to the point that you felt there was an agreement that [Evert] would marry you, correct?

[ANGELA:] There was an agreement that we were going to get married in 2016. We started those discussions to be clear.

[COUNSEL FOR EVERT:] And that agreement was to marry.

[ANGELA:] Well, eventually, yes.

[COUNSEL FOR EVERT:] And you believe that you had an agreement that he would support you or at least contribute financially to you in the future, correct?

[ANGELA:] That is what he told me.

[COUNSEL FOR EVERT:] And was that regardless of marriage?

[ANGELA:] I would say so, yes.

[COUNSEL FOR EVERT:] And to what extent did you understand that [Evert] was to support you financially?

[ANGELA:] *He had agreed before we began looking at homes that he would pay half the down payment or repay me half the down payment and that we would share all the living expenses associated with the home.*

[COUNSEL FOR EVERT:] And you believe that he was obligated to share in those costs and expenses of the house and your lives together "'til death do us part", correct?

[ANGELA:] Well, assuming a 30-year mortgage at age 50, that's pretty much the end of your life.

10

[COUNSEL FOR EVERT:] But those were your words though, right, "'til death do us part"?

[ANGELA:] I stated that in my deposition.

[COUNSEL FOR EVERT:] And when you bought 614 Brownstone, you bought—you claim you bought 614 Brownstone Drive because you felt you had a commitment for future support and to marry you in the future by [Evert], correct?

[ANGELA:] That is what he told me.

[COUNSEL FOR EVERT:] And did you discuss a date for marriage or place for marriage?

[ANGELA:] Actually, yes, we did. [Evert] suggested that we get married here at the Courthouse.

[COUNSEL FOR EVERT:] And when you purchased 614 Brownstone Drive, you had no specific date on which the marriage was to occur, correct?

[ANGELA:] That's correct, we did not have a date.

\* \* \*

[COUNSEL FOR EVERT:] *So, the actions you took with respect to the home purchase were all based upon what you believed was a promise to marry and share a life together, correct?*

[ANGELA:] *It was promise* [sic] *to purchase a home together. Marriage was coming later.*

[COUNSEL FOR EVERT:] You just testified that you—that there was a promise to marry—

\* \* \*

[ANGELA:] *We had discussed marriage, but that wasn't based on the home purchase. The home purchase agreement was to share and put half down.*

(Emphases added).

Angela called Evert in her case. Evert denied having discussions with Angela in April 2016 about moving in together or getting married. He asserted that Angela's desire to buy a home was solely for her and her son, denying that they had purchased a house

11

together. He denied having promised her that he would help with the down payment, pay half of the mortgage on the home, or pay for home repairs. He claimed that Angela had not asked him to contribute towards the down payment.

Evert acknowledged that he served as Angela's real estate agent for the purchase of the Brownstone house. He also admitted that he owed her a fiduciary duty as her agent while the buyer's agreement was in effect when she closed on the Brownstone home. He did not recall whether he disclosed to her during that time whether he was having sexual intercourse with other women. He claimed that they were both seeing other people at different points during their relationship.

Evert acknowledged having received a commission of $13,253.25 for the sale of the Brownstone home. He claimed that Angela knew that he would receive a commission, but he was not sure if he actually told her that he would. He "guess[ed]" that he told her that the commission that went to the broker (Taylor Properties) would ultimately be paid to him around the time she signed the buyer representation agreement.

Evert denied proposing to Angela. He denied ever discussing marriage with her until December 2017, after she had purchased the Brownstone house. Even then, he gave her a "handful of reasons" why he could not get married and would not get married. Primarily, he would not consider marriage until his daughter was eighteen. He claimed to be unaware that she had purchased a wedding dress or had gone to look for a wedding venue, and he denied going ring shopping or scheduling engagement photos.

After moving out of Kim's home on May 2, 2018, Evert lived in one of his other properties. He explained that he was looking to purchase a primary residence, but the

12

property he was looking at fell through, and that he was busy handling the affairs arising from his father's death while he was away at War College. He testified that Angela offered for him to stay with her so he could be close to work, and that he moved in with her in July of 2018.

While staying with Angela, Evert was looking for somewhere else to live. He indicated that beginning in May 2018, he started paying her a fixed amount plus a variable amount depending on utilities. However, he denied knowing that part of it was for half the mortgage.

In September 2018, Angela found some pictures of women and a real estate contract on her computer and suspected him of cheating on her. At the time, Evert was in fact in a romantic relationship with another woman. He acknowledged having a conversation with Angela during which he told her that their relationship was exclusive and sexually monogamous. However, he testified that there may have been times when she felt they were exclusive, but he did not. He claimed that they had a few conversations about dating other people. He acknowledged that he was talking to another woman the morning of April 27, 2019, when Angela discovered him on the security video.

Evert admitted to living with Kim as of September 2016, when he claimed he began being sexually intimate with Angela. He met Kim in 2013 and moved in with her in November 2015. They were sexually intimate while living together, but were not having sex as of February 2016, when the two began experiencing challenges and having disagreements in their relationship. He also denied discussing buying a house together with Kim. He acknowledged having served as Kim's real estate agent for the purchase of the

Harlequin home and for the sale of the Crosslanes home, as well as having received commissions for both transactions.

Evert admitted that he did not inform Angela about his prior dating relationship with Kim and that he had continued to live with Kim when he began a sexual relationship with Angela. He also acknowledged having sexual relations with another woman in April and/or May 2016. Additionally, he dated yet another woman while living with Angela around April and/or May 2018 and started a sexual relationship with her in December 2018. Evert assisted this woman with her home-buying process and served as her real estate agent, earning a commission of $6,025.

### Evert's Motion for Judgment

At the end of Angela's case, Evert made a motion for judgment. In relevant part, he argued that FL § 3-102 and *Miller v. Ratner*, 114 Md. App. 18 (1997), barred the fraud and breach of fiduciary duty claims. He contended that the promise of marriage impermissibly tainted Angela's claims and that her claims grew out of an exclusive monogamous relationship with the expectation of marriage.

Angela argued that the claims were based on Evert's lies about the status of their relationship, his promise to buy the Brownstone property with her, and share the down payment and expenses. She argued that these false representations were intended to persuade her to purchase the property so he could earn a commission on the sale.

The court agreed with Evert and dismissed the fraud and breach of fiduciary duty claims. It explained:

14

I just think Miller versus Ratner and it says to be liberally construed over and over again is on point. It even talks about creatively trying to create claims and causes of action to take it out of the Heart Balm Statute, which is—and I'm not faulting them—which is I feel like a little bit what went on here.

I gave [Angela] the opportunity to present the entire case, her case. And I reread Miller versus Ratner twice and I just can't get around it. I'm going to dismiss both the fraud and the breach of fiduciary duty claim.

Within ten days of the order dismissing claims, Angela filed a Motion to Alter or Amend Judgment. The court denied the motion, and she timely appealed.

We shall provide additional facts in the discussion as necessary.

## DISCUSSION

## I.

## Fraud and Breach of Fiduciary Duty

Angela argues that the circuit court erred in granting judgment after her case and dismissing the fraud and breach of fiduciary duty claims. The elements of the "cause of action in what is variously known as fraud, deceit, or intentional misrepresentation" are:

> (1) [T]hat a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with [ ] reckless indifference . . . ; (3) that the misrepresentation was made for the purpose of defrauding some other person; (4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation.

*Bradley*, 208 Md. App. at 261 (citations omitted).

The elements of breach of fiduciary duty are "(1) the existence of a fiduciary relationship; (2) breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Plank v. Cherneski*, 469 Md. 548, 559 (2020) (citations omitted). In a

15

case involving the fiduciary duties of real estate agents, "a real estate broker's liability is founded on the law of agency." *Lewis v. Long & Foster Real Est., Inc.*, 85 Md. App. 754, 761 (1991). If there is an agency relationship, the agent has "'a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.'" *Braude v. Robb*, 255 Md. App. 383, 402 (2022) (citation omitted). "'[T]he powers of the agent are to be exercised for the benefit of the principal only[.]'" *Id.* (citation omitted). This means that "an agent is under a strict duty to avoid any conflict between his or her self-interest and that of the principal[.]" *Green v. H & R Block, Inc.*, 355 Md. 488, 517–18 (1999). It also means that "[o]ne of the primary obligations of an agent to his or her principal is to disclose any information the principal may reasonably want to know." *Id.* at 518. "Where an agent breaches a duty to the principal and profits from the breach, the principal may maintain an action to recover those profits for her or himself." *Id.* at 519.

## A.

## Overview of FL § 3-102

FL § 3-102(a) precludes the cause of action for breach of a promise to marry. It provides:

> Unless the individual is pregnant,[7] an individual: (1) has no cause of action for breach of promise to marry; and (2) may not bring an action for breach of promise to marry regardless of where the cause of action arose.

---

[7] There was no evidence that Angela was pregnant.

16

FL § 3-102(a) (1984) (previously codified under Md. Code Ann., Art. 75C (1947 Supp.).[8]

The General Assembly explained the statute's purpose:

> The remedies heretofore provided by law for the enforcement of actions based upon alleged alienation of affections[9] and alleged breach of promise to marry, having been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances and such remedies having been exercised by unscrupulous persons for their unjust enrichment, and such remedies having furnished vehicles for the commission or attempted commission of crime and in many cases having resulted in the perpetration of frauds, it is hereby declared as the public policy of the State that the best interests of the people of the State will be served by the abolition of such remedies.

*Miller*, 114 Md. App. at 28 (quoting "Declaration of Public Policy of State").

Since the abolition of this action, there have only been two Maryland reported cases that have addressed the scope of this statute: *Miller v. Ratner*, 114 Md. App. 18 (1997), and *Bradley v. Bradley*, 208 Md. App. 249 (2012).

---

[8] Maryland's statute, like similar statutes in other jurisdictions, is commonly referred to as a "heart balm" statute. The term "is an indication that public policy no longer considers money damages appropriate for what is perceived as only an ordinary broken heart." Jeffrey D. Kobar, *Heartbalm Statutes and Deceit Actions*, 83 Mich. L. Rev. 1770, 1778 (1985). The term "was not only catchy, but it suggested . . . that [the causes of action] were all based on the erroneous hypothesis that money can compensate for wounded feelings." Frederick L. Kane, *Heart Balm and Public Policy*, 5 Fordham L. Rev. 63, 65 (1936). Sometimes courts refer to such statutes as "anti-heart balm" statutes.

[9] The General Assembly also abolished the cause of action for alienation of affection in what is now codified under FL § 3-103 ("(a) An individual has no cause of action for alienation of affections. (b) An individual may not bring an action for alienation of affections regardless of where the cause of action arose."). Alienation of affection is not at issue in this case. However, we consider cases involving alienation of affection to have strong precedential value in breach-of-promise-to-marry cases. *Miller*, 114 Md. App. at 33.

### 1. *Miller v. Ratner*

In *Miller v. Ratner*, 114 Md. App. 18 (1997), this Court held that the plaintiff's claims of breach of contract and intentional infliction of emotional distress against her partner were barred by the statute. There, the defendant invited the plaintiff to move in with him. *Id.* at 21. After living together for three years, the plaintiff became ill with breast cancer, and the defendant ultimately ordered her to leave the house. *Id.* At first, the plaintiff refused to go, and the defendant and his brother taunted her and threatened her until she moved out. *Id.* at 21–22. The defendant continued to harass the plaintiff even after she moved. *Id.*

The plaintiff then filed suit against the defendant, asserting, in relevant part, breach of contract, intentional infliction of emotional distress, and civil conspiracy by both the defendant and his brother to inflict severe emotional distress on her. *Id.* at 24. Threaded through all her claims were the allegations that there was a mutual understanding that the defendant and the plaintiff were making a permanent commitment that "would be followed by marriage"; that plaintiff relied upon the defendant's "promises" and moved into the defendant's house; and that, "[i]n anticipation of their marriage," the defendant told her that "he would take care of her." *Id.* at 23. She averred in a scheduling conference statement that they were engaged to be married. *Id.* at 23-24.

The defendant moved for summary judgment on these counts, arguing, *inter alia*, that the plaintiff's claims were, in substance, claims for breach of promise to marry and were barred under Maryland law. *Id.* at 24–25. The circuit court granted the motion, and this Court affirmed. *Id.* at 25–26.

We explained that "each and every count contained in [the plaintiff's] complaints incorporated that her action was, **at least in part**, based upon 'a permanent commitment . . . followed by marriage' and *'promises'* and that [the defendant] '[i]n anticipation of their marriage . . . would take care of her.'" *Id*. at 42 (emphases in original); *id*. at 53 ("in every count, assert[ed], at least in important part, that her grievances arose out of promises of and in anticipation of marriage—a marriage that, because of [the defendant's] change of heart (or mind), did not occur"). The basis of the plaintiff's claims was confirmed during her deposition, during which she testified that there was an agreement to marry, that the defendant would financially support her regardless of marriage, and that she moved in because she felt she had a commitment in her future support and to marry. *Id.* at 52. We further explained that the alleged actions of the defendant and his brother did not occur until after the defendant terminated the relationship, he ordered the plaintiff to leave his house, and she refused to leave. *Id.* at 53. Thus, we said, it was clear that, "not only was their relationship based upon their promises in anticipation of marriage, the unilateral termination was a rejection (a breach) of those promises and a nullification of the anticipation of the parties." *Id.* Because the only basis for the plaintiff to remain in the house rested on the promise of marriage, her causes of action against the defendant were tainted by the breach of a promise to marry. *Id.* at 53–54. We explained that "[f]or us to reverse the grants of summary judgment in favor of [the defendant and his brother] would require this Court to ignore the underlying bases, proffered by [the plaintiff] herself, for all of her claims. The statute, by its very terms, was intended to be and is remedial and is to be construed liberally to effectuate that remedial purpose." *Id*. at 42.

19

We observed that certain situations may allow a claim despite a promise to marry. For instance, deceit related to bigamy or other legal impediments to marriage presented a circumstance in which tortious actions were allowed despite the existence of promises of marriage between the parties. *Id.* at 46 (citing *Lampus v. Lampus*, 660 A.2d 1308 (Pa. 1995) (court upholding claims for deceit, negligent misrepresentation, concealment, and negligence where the man, knowing that his prior divorce had been declared invalid, nevertheless entered into another marriage, unbeknownst to woman who later discovered that her marriage had been bigamous) and *Jackson v. Brown*, 904 P.2d 685 (Utah 1995) (preserving the right to maintain action, explaining that "losses . . . may be recoverable under a theory of reasonable reliance or breach of contract" and permitting intentional infliction of emotional distress claim where defendant was already married, participated with the plaintiff in planning a wedding with her, but on the morning of the wedding told her he would not marry her)).

Referring to the examples of *Lampus* and *Jackson*, *supra*, where the defendants deceitfully concealed their marital status when they induced the women to marry, *i.e.*, to move in with them in anticipation of marriage, we said that

> [S]uch actions may well constitute a deceit that might, even in this State, support a tortious action because a person would fraudulently be caused to change his or her position in reliance on an intentional misrepresentation of the promisor's then present status. It would not be an action for failure to keep a promise [to marry], but an action grounded in deceit and fraud. The first instance, failing to keep a promise to marry, is a breach of promise to marry; the second, making a misrepresentation of one's marital status in order to cause one to change her position may, in some circumstances, constitute the tort of deceit.

*Miller*, 114 Md. App. at 47–48.

20

We also noted that "nonmarital partners can certainly be subject to suit for promises made independent of promises to marry so long as the actions are not shams intended to circumvent the actions prohibited by statute. Actions to establish constructive or resulting trusts, in replevin, for conversion, to enforce purchase agreements are a few that come to mind." *Id.* at 48.

We recognized that palimony actions[10] may be maintained, even when a plaintiff acknowledges that a relationship was based on promises and commitments to marry, or was in anticipation of marriage, so long as the claim does not involve the applicability of the statute. *Id.* at 50. Though we did not foreclose the possibility of such actions, to survive summary judgment, the complaint would "have to be carefully framed, based on proper and supportable allegations, and devoid of factual circumstances implicating the applicability of the statute." *Id.*

We also explained that if the plaintiff's cause of action is based on a relationship with the defendant that is not personal and is not grounded on a breach of a promise to marry, then the action may be exempt from the statutory bar. *Id.* at 40 (discussing *Figueiredo-Torres v. Nickel*, 321 Md. 642, 646–51 (1991), an alienation of affection case, in which the Supreme Court of Maryland held that the couple's malpractice action against their psychologist, who had been providing marriage counseling and who was also having an affair with the wife, was not barred).

---

[10] The term "palimony" can be understood as alimony from or for a "pal" "awarded to one of the partners in a romantic relationship after a breakup of that relationship following a long period of living together." *Attorney Grievance Comm'n of Maryland v. Ficker*, 319 Md. 305, 320–21 (1990) (citing dictionary definition).

In *Miller*, we concluded that there was nothing to indicate that the plaintiff's claims fell into a situation that would exempt them from the statutory bar:

> We have examined closely and extensively the record forwarded to us for any indication that [the plaintiff's] cause of action is based on anything other than her previous personal relationship with [the defendant] that was, according to the averments of her complaints—made by her applicable to all counts—and her subsequent deposition testimony, based on their "permanent commitment that would be followed by marriage" and "promises . . . [i]n anticipation of their marriage." At one point, a document proffered by her contained her assertion that she and [the defendant] were engaged to be married. We have found no indication of any other fundamental relationship between the parties or other basis for the actions filed.

*Id.* at 40–41.

> In the case *sub judice,* there was neither evidence, nor averments, that there was any legal impediment to a marriage between [the plaintiff and defendant]. *Nor was there any allegation that when the initial promises in respect to marriage were made, they were not sincere. The case at bar is a pure "change of mind" case. It is exactly that type of case that heart balm statutes are intended to prohibit.*

*Id.* at 47 (emphasis added).

### 2. *Bradley v. Bradley*

In *Bradley v. Bradley*, 208 Md. App. 249 (2012), we recognized a case of fraud that was not barred by statute. In that case, the plaintiff sued her husband for intentional misrepresentation and negligent misrepresentation, as they had married while his divorce from his previous wife was still pending. *Id.* at 254–55. We cited *Miller*, explaining that the "policy is to protect the 'pure change of mind case[s]' where a defendant promises to marry but later changes his mind and refuses to marry." *Id.* at 262 (cleaned up) (internal quotations omitted).

22

We concluded that the tort claims in *Bradley* were not barred by FL § 3-102. We explained that:

> [Plaintiff's] causes of action were for misrepresentation, not breach of promise to marry. . . . [Defendant's] claim that he was divorced constituted a false statement, and such statements are actionable in tort. We see no reason to contort this claim into one for breach of promise to marry. The tort claims do not arise from [defendant's] failure to marry [plaintiff], but from [defendant's] negligent and/or intentional conduct in telling [plaintiff] that he was divorced when in fact he was married.

*Id.*

## B.

### Analysis

Angela argues that the circuit court erred in granting judgment and dismissing the fraud and breach of fiduciary duty claims after her case, because they were not based on a breach of a promise to marry. Evert responds that the court correctly dismissed the claims under FL § 3-102 because the claims arose out of and were tainted by a breach of a promise to marry.

Maryland Rule 2-519(a) permits a defendant to make a motion for judgment at the close of the plaintiff's case. When assessing the motion, the trial court must consider all evidence and inferences in the light most favorable to the non-moving party. Md. Rule 2-519(b). The appropriate standard of review is *de novo*, because the trial court decided that the misrepresentation and breach of fiduciary duty claims were barred by statute and Maryland case law. *See Bradley*, 208 Md. App. at 260. Where the trial court has granted a motion for judgment, this Court must, "in determining whether the ruling was proper, resolve all conflicts in the evidence in favor of the plaintiff and assume the truth of all

23

evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the right of the plaintiff to recover. Or, as it is often stated, the evidence must be considered in the light most favorable to the plaintiff." *Campbell v. Jenifer*, 222 Md. 106, 110 (1960).

We conclude that the circuit court erred in dismissing the fraud and breach of fiduciary duty claims after Angela presented her case. Unlike *Miller*, this case was not a "pure 'change of mind' case." 114 Md. App. at 47. The evidence presented at trial in Angela's case demonstrated that her claims of fraud and breach of fiduciary duty were not based on a broken promise to marry. Instead, both claims arose from Evert deceiving Angela into buying a house on the premise that they were in a long-term, monogamous relationship, they would combine families and live together, and Evert would contribute half of the down payment for the home and share household expenses. Angela testified that had she known Evert was living with Kim or involved in other sexual relationships at that time, she would not have sought a new home, let alone signed a buyer's agreement with Evert as her agent or the sales contract.

Evert highlights Angela's cross-examination testimony reproduced above as well as evidence of her desire to marry and some of her wedding planning after she purchased the Brownstone house. He interprets this evidence to mean that Angela purchased the house because she believed she had a commitment for future support and marriage. Based on this evidence, he contends that her claims are "**at least in part**, based upon 'a permanent commitment . . . followed by marriage'" and therefore are barred by the statute. *Miller*, 114 Md. App. at 42 (emphasis in original).

24

Although Angela and Evert had discussed marriage, and she expected they would eventually marry, Angela clarified that her decision to purchase the Brownstone home (and by extension, her decision to engage Evert as her agent in the sale) was not based on any promise of marriage: "We had discussed marriage, but that wasn't based on the home purchase. The home purchase agreement was to share and put half down."

As stated, the standard of review requires this Court to "resolve all conflicts in the evidence in favor of [Angela] and assume the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support [her] right to recover." *Campbell*, 222 Md. at 110. Applying this standard, we conclude that the evidence and inferences, viewed in the light most favorable to Angela, demonstrate that her decision to purchase the Brownstone home and engage Evert as her agent in the sale was not based "at least in part" on a commitment to marry. Rather, she decided to buy the house because Evert agreed to contribute half of the down payment and share household expenses. Her testimony suggests that Evert's representations about their long-term, monogamous relationship and desire to combine families engendered Angela's trust in his financial commitments regarding the Brownstone house, ultimately leading to her decision to purchase it. Thus, the real basis of Angela's claims was not that Evert wronged her by not marrying her. Instead, her claims were rooted in Evert's deception about the nature of their relationship and his financial commitments concerning the Brownstone house. His alleged misrepresentations led her to purchase the house, allowing him to act as her agent and earn a commission on the sale. For the reasons stated, Angela's tort claims are not barred by the statute, and the court erred in granting judgment after her case and dismissing the claims.

25

Evert presents various arguments in favor of upholding the dismissal of the tort claims. *First*, he argues that claims excluded from the statutory bar are limited to misrepresentation of marital status and legal impossibility, citing examples from *Miller* and *Bradley*. Based on this premise, he asserts that Angela's tort claims do not fall in these categories.

However, we do not interpret *Miller* or *Bradley* as limiting claims that survive the statute's bar to specific types. Instead, the inquiry focuses on whether the real basis of the claim is a breach of a promise to marry. In *Miller*, we expressly acknowledged that nonmarital partners could be subject to suit for promises made independently of promises to marry, so long as the actions are not shams intended to circumvent the actions prohibited by statute. 114 Md. App. at 48. We provided a non-exhaustive list of examples, including establishing a constructive or resulting trust, replevin, conversion, and enforcing purchase agreements. *Id.* We also recognized that palimony actions may be possible, even if a plaintiff concedes that the relationship was based on promises and commitments to marry or in anticipation of marriage, as long as the cause of action does not implicate the statute. *Id.* at 50. In addition, we considered the possibility of a claim involving a professional relationship distinct from a personal one, and not based on a breach of a promise to marry. *Id.* at 39–40.

Decisions by courts in other jurisdictions with heart balm statutes have not limited claims outside the scope of the statute's bar to those based on misrepresentation of marital status and legal impossibility. *See, e.g.*, *Pavlicic v. Vogtsberger*, 136 A.2d 127, 131–32 (Pa. 1957) (holding that the heart balm statute did not bar plaintiff's claim to recover gifts

26

conditional on the happening of the marriage; during their courtship, plaintiff gave defendant expensive gifts to include, at her urging, a car, satisfaction of a mortgage debt, and money to buy a saloon, after which she absconded); *Piccininni v. Hajus*, 429 A.2d 886, 887–89 (Conn. 1980) (holding that the heart balm statute did not bar plaintiff's action against defendant for fraudulently inducing plaintiff to spend money renovating her house, based on her promise to marry him and for them to live in her home after marriage because "plaintiff does not here assert that the defendant wronged him in failing to marry him; rather, he is asserting that the defendant wronged him in fraudulently inducing him to transfer property to her"); *Hanna J Invs., LLC v. Dlin*, Case No. WMN–10–2255, 2010 WL 5099251, at *6 (D. Md. Dec. 8, 2010) (holding that FL § 3-102 did not bar plaintiff company's breach of contract claim against defendant because the claim was for the breach of a separate and independent contract for the payment of wedding expenses in exchange for defendant's behavior to remain monogamous with his fiancée). Accordingly, we reject Evert's contention that the exception to the statutory bar is limited to claims involving misrepresentation of marital status and legal impossibility.

*Next*, Evert argues that the statute bars a plaintiff's claim, regardless of whether a defendant's promise to marry was insincere or fraudulent. Therefore, he contends, Angela's tort claims of fraud should also be barred. He cites various decisions by courts in other jurisdictions that have barred claims alleging insincere or fraudulent promises to marry. *See Yang v. Lee*, 163 F.Supp.2d 554, 559 (D. Md. 2001) (parents' action against daughter's ex-fiancé, who broke off engagement, for intentional misrepresentation relating to his sexual preference and sexual history was in essence claim for breach of promise to marry,

27

which was barred under FL § 3-102); *Waddell v. Briggs*, 381 A.2d 1132, 1136–37 (Me. 1978) (plaintiff parents' action to recover compensatory and punitive damages for defendant's breach of his promise to marry plaintiffs' daughter, as well as cause of action sounding in tort to recover for malicious and intentional infliction of mental suffering as a result of defendant's negligent failure to seasonably inform plaintiffs of his intended nonattendance at wedding ceremony were barred by heart balm statute); *Vrabel v. Vrabel*, 459 N.E.2d 1298, 1302–03 (Ohio Ct. App. 1983) (heart balm statute barred action by plaintiff former wife alleging that former husband falsely induced her to quit her job and return to area where he resided so that they could be reunited in a reconciliated relationship; plaintiff's claim arose out of breach of an implicit new promise to marry, or a fraudulent representation of intent to marry).

Evert cites other decisions by courts that have barred claims under the heart balm statute, stating that courts should not delve into a suitor's mind to determine the sincerity of his marriage proposal. *See A.B. v. C.D.*, 36 F.Supp.85, 87 (E.D. Pa. 1940) ("The legislatures did not intend that courts should explore the minds of suitors and determine their sincerity at the moment of proposal of marriage but rather declared it to be the policy of the state that in the event a breach of the promise occurs relief will be denied in the courts."); *Boyd v. Boyd*, 228 Cal.App.2d 374, 381 (Cal. Ct. App. 1964) ("[T]he gravamen of Count II is defendant's fraudulent promise to live with and support plaintiff, that is, to cohabit after marriage. The allegation calls upon the trial court to explore the suitor's mind to determine the sincerity of his marriage proposal, a function decried by statutory policy."); *Askew v. Askew*, 22 Cal.App.4th 942, 959 (Cal. Ct. App. 1994) (observing that

"[t]he very nature of the 'fraud' is bound up in [defendant wife's] sincerity concerning some of her most intimate feelings and desires [about plaintiff husband]" and stating that "courts should stay out of the bedroom"); *Shea v. Cameron*, 93 N.E.3d 870, 877 (Mass. App. Ct. 2018) ("This broad reading of [the heart balm statute] furthers the legislative intent that courts should not 'explore the minds of' consenting partners in order to 'determine their sincerity.'" (citation omitted)).

Evert's reliance on these cases is misplaced. These decisions addressed insincere and fraudulent promises to marry, framed as tort actions, which were really claims for breach of a promise to marry. These decisions emphasized that a heart balm statute should not be circumvented by recharacterizing an action for breach of promise to marry as a tort claim. It was in that context that these courts stated that requiring a court to explore whether a promise to marry was sincerely intended would contravene the legislative intent. However, as we explained, Angela's claims of fraud and breach of fiduciary duty were based on promises independent of any promise to marry. They were not "shams" intended to circumvent the actions prohibited by statute. *Miller*, 114 Md. App. at 48.

*Finally*, Evert argues that the statute bars Angela's tort claims because their long-term, monogamous relationship and their anticipated indefinite cohabitation clearly constituted a promise to marry. Based on this premise, he argues that Angela's claims are at least in part founded on a permanent commitment followed by marriage and promises in anticipation of their marriage, like in *Miller*. From there, Evert asserts that any agreements Angela claims existed between them regarding the Brownstone house were not "completely free of promises in anticipation of marriage." *Miller*, 114 Md. App. at 51.

We reject Evert's attempt to contort the tort claims into one for a breach of a promise to marry. Preliminarily, we observe that a long-term monogamous relationship with the anticipation of living together indefinitely does not constitute a promise of marriage. Indeed, in *Miller*, we recognized palimony actions where couples agree to live together long-term without making a promise of marriage.

Even if a promise of marriage existed, we are not persuaded by Evert's suggestion that if a proposed marriage is in any way associated with a plaintiff's claim, the claim must be barred under the statute. We do not interpret *Miller* to mean that the circumstances must be devoid of any references to a promise to marry to avoid the statutory bar. Instead, we said that to survive the statutory bar, the claim must be "free of any taint of a <u>breach of promise to marry</u>." *Id.* at 50 (emphases added); *id.* at 54 (explaining that the mental distress count was "fatally tainted with the ramification of the prohibited <u>breach of promise [to marry] action</u>" (emphases added)).

Courts in other jurisdictions have explicitly held that a claim's close association with a proposed marriage does not automatically bar it under the heart balm statute. As the Supreme Court of Pennsylvania explained,

> The abolition is confined to actions *for* breach of contract to marry, that is, the actual fracture of the wedding contract.
>
> It thus follows that a breach of any contract which is not the actual contract for marriage itself, **no matter how closely associated with the proposed marriage,** is actionable.

*Pavlicic*, 136 A.2d at 131–32 (emphasis added in bold).

The Court of Appeals of New York similarly recognized that:

30

> *While a promise of marriage may underlie both* this type of action *[for inducing a woman to enter into a void marital relationship by means of sham and pretended ceremony] and those encompassed by the statute*, the wrong complained of by the plaintiff in this case is not that the defendant seduced her or that he broke his promise to marry her but that he induced her to live with him as his wife by falsely representing that the ceremony, which he had arranged, was legitimate and that they were duly and properly married.

*Tuck v. Tuck,* 200 N.E.2d 554, 556 (N.Y. 1964) (emphases added).

Likewise, the Supreme Court of Connecticut explained:

> The plaintiff here is not asking for damages because of a broken heart or a mortified spirit. He is asking for the return of things which he bestowed in reliance upon the defendant's fraudulent representations. The Act does not preclude an action for restitution of specific property or money transferred in reliance on various false and fraudulent representation, apart from any promise to marry, as to their intended use. A proceeding may still be maintained which *although occasioned by a breach of contract to marry, and in a sense based upon the breach*, is not brought to recover for the breach itself.

*Piccininni*, 429 A.2d at 888–89 (emphasis added).

These cases reinforce the principles established in *Miller* and *Bradley*, which conclude that the statute does not bar a claim if the real basis of the claim is for something other than a breach of a promise to marry. This remains true even if there was a promise to marry, a discussion about marriage, or an expectation of marriage. As stated, although the parties discussed marriage, and Angela expected that they would eventually marry, the tort claims were not based on a breach of a promise to marry.

We recognize that FL § 3-102 "is remedial and shall be construed liberally to accomplish its purpose." However, we cannot read into that mandate "any broadening of the statute so as to make it operative beyond the field which it undertakes to cover." *Di Blasio v. Kolodner*, 233 Md. 512, 519 (1964). "We find no reason for holding that the

General Assembly did not mean exactly what it said—no more and no less—with regard to the kinds of causes of action which it undertook to abolish." *Id.* The statute was enacted to prevent fraud by an unscrupulous plaintiff. However, permitting a defendant who acts wrongfully to use the statute as a shield against claims that are not for a breach of a promise to marry—simply because the couple discussed or may have mutually agreed to marry—would "place a premium on trickery, cunning, and duplicitous dealing." *Pavlicic*, 136 A.2d at 130. For the reasons stated, we hold that the fraud and breach of fiduciary duty claims are not barred under the statute, and the court erred in granting Evert's motion for judgment on those claims.

## II.

## Unjust Enrichment

Angela argues that the circuit court erred in granting summary judgment in Evert's favor on her claim for unjust enrichment. To sustain a claim based upon unjust enrichment, the plaintiff must establish:

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.

*Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007).[11]

---

[11] "[U]njust enrichment does not exist where a benefit has officiously been thrust on another." *Royal Inv. Grp., LLC v. Wang*, 183 Md. App. 406, 441–42 (2008). In his motion for summary judgment before the circuit court, Evert argued that Angela thrust the obligation of serving as her real estate agent on him and thus she officiously conferred the benefit of commission on him. However, he makes no such contention to this Court.

## A.

### Additional Background

At the motions hearing, Evert argued that the sellers were responsible for paying Evert's commission. Because Angela did not pay it, he contended that the claim of unjust enrichment was "not even on the table." Following Evert's argument, the court questioned Angela's counsel: "Let's say [Evert] was unjustly enriched. . . . Where would that money go to? Back to [Angela]?" Angela's counsel said that she should be awarded the amount of the commission. Her counsel explained that it is immaterial that a third party paid the funds; unjust enrichment is not intended to compensate a plaintiff for damages. Instead, it is designed to disgorge profits from a defendant who is not entitled to them.

After taking the motion under advisement, the court entered an order summarily granting summary judgment on the unjust enrichment claim. Although the order did not provide a reason for granting the motion, the record indicates that the court granted the motion because Angela did not pay the commission and would thus not be entitled to it even if the jury found that Evert was unjustly enriched.

## B.

### Analysis

Angela argues that the court erred in granting summary judgment on her unjust enrichment claim regarding the real estate commission Evert retained. She argues that, under the first element of unjust enrichment, it is immaterial that she did not pay the commission. Evert responds that Angela would not be entitled to restitution because the funds used to pay his commission did not belong to her.

33

A trial court can grant a summary judgment motion if "there is no genuine dispute as to any material fact and . . . the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f). We review the trial court's conclusions of law *de novo. Messing v. Bank of Am., N.A.*, 373 Md. 672, 684 (2003). In considering the trial court's conclusions of law, "we construe the facts properly before the court, and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party." *Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners*, 380 Md. 106, 114 (2004).

## 1. Benefit Conferred

Unjust enrichment "is concerned with the receipt of benefits that yield a measurable increase in the recipient's wealth," so "the benefit that is the basis of a restitution claim may take any form." Restatement (Third) of Restitution and Unjust Enrichment § 1, cmt. d (2011) ("Third Restatement").

> A person confers a benefit upon another if [s]he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or *in any way adds to the other's security or advantage.* [Sh]e confers a benefit not only where [s]he adds to the property of another, but also where [s]he saves the other from expense or loss. The word "benefit," therefore, denotes *any form of advantage.*

Restatement (First) of Restitution § 1, cmt. b (1937) (emphasis added); *see Hamilton & Spiegel, Inc. v. Bd. of Educ. of Montgomery Cnty.*, 233 Md. 196, 200–01 (1963) (quoting Restatement (First) of Restitution § 1 (1937), cmt. b); *accord State Cent. Collection Unit v. Kossol*, 138 Md. App. 338, 347 (2001).

34

It is not required that a "benefit conferred in an unjust enrichment action come necessarily and directly to the defendant from the plaintiff[']s own resources." *Hill*, 402 Md. at 298; *Plitt v. Greenberg*, 242 Md. 359, 364 (1966) ("'It is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner.'" (citation omitted)).

In *Alternatives Unlimited, Inc. v. New Baltimore City Board of School Commissioners*, 155 Md. App. 415 (2004), an education services contractor submitted and won a bid to provide a dropout prevention program for the Baltimore City School Board for one school year. *Id.* at 431–32. The contractor then claimed it had an agreement to continue providing services after that year. *Id.* at 434–36. However, the School Board denied that a contract for the second year was ever fully and properly entered into in accordance with its approval process. *Id.* at 449–50. The contractor nevertheless provided the programming and, in the ensuing legal action, claimed that the State of Maryland then paid the School System over $284,750 in per-pupil allocations based on the program's enrollment. *Id.* at 436. According to the contractor, it was entitled to restitution of this benefit under a theory of unjust enrichment. *Id.* at 423. The circuit court granted summary judgment in favor of the Board, and this Court reversed. *Id.* at 511–12.

We explained that the provider may be able to meet the first element of unjust enrichment—"[a] benefit conferred upon the defendant by the plaintiff": "it well may be that [the contractor] will be able to prove that the State, because of [the contractor's program], provided to the Board a certain amount of funding to which the Board would not

35

otherwise have been entitled." *Id.* at 496–97. This case illustrates that the first element of unjust enrichment can be satisfied even though the benefit conferred consisted of funds paid by another that were not the plaintiff's.

## 2. Restitution and Measure of Damages

"A person who is unjustly enriched at the expense of another is subject to liability in restitution." Third Restatement § 1. "[T]he classic measurement of unjust enrichment damages is the 'gain to the defendant, not the loss by the plaintiff.'" *Mogavero v. Silverstein*, 142 Md. App. 259, 276 (2002) (citation omitted). "[I]n the damage action[,] the plaintiff seeks to recover for the harm done to [her], whereas in the restitution action[,] [s]he seeks to recover the gain acquired by the defendant through the wrongful act." 1 George E. Palmer, *The Law of Restitution* § 2.1 at 51 (1978) ("Palmer").

> While the paradigm case of unjust enrichment is one in which the benefit on one side of the transaction corresponds to an observable loss on the other, the consecrated formula "at the expense of another" can also mean "in violation of the other's legally protected rights," *without the need to show that the claimant has suffered a loss*.

Third Restatement §1, cmt. a (emphasis added); *see* Daniel Friedmann, *Restitution of Benefits Obtained Through the Appropriation of Property or the Commission of a Wrong*, 80 Colum. L. Rev. 504, 508 (1980) ("Friedmann") ("[R]estitution may be granted even though no property interests, even in the broadest sense, are involved.").

As the Supreme Court of Maryland summarized:

> A successful unjust enrichment claim serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and *even though the plaintiff may have suffered no demonstrable losses. A person who receives a benefit* by reason of an infringement of another person's

36

interest, or of loss suffered by the other, *owes restitution to h[er]* in the manner and amount necessary to prevent unjust enrichment. *The restitution claim . . . is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep.*

*Hill*, 402 Md. at 295–96 (emphases added) (citations omitted).

"Although the basis of recovery in unjust enrichment is not based on fault, misconduct or fault of one of the parties is sometimes considered in determining whether to permit recovery." *Id.* at 297. A defendant's fraud, even if it did not result in the appropriation of the plaintiff's property, may still entitle the plaintiff to restitution. The Third Restatement provides the following illustration:

> A is induced by B's fraud to sell her house to C, who purchases for value without notice of B's fraud. A is not entitled to restitution from C. *If the transaction results in <u>any</u> benefit to B, <u>A is entitled to restitution from B</u>.*

Third Restatement § 13, cmt. g, illus. 16 (emphases added).

Wrongs other than fraud may also entitle a plaintiff to restitution even though the wrong did not result in the appropriation of the plaintiff's property. "[U]nder certain circumstances a fiduciary may be required to disgorge profits obtained through the breach of his duty even if the breach involved no appropriation of the beneficiary's property." Friedmann at 508 (citing George E. Palmer at 141 (explaining that a fiduciary who profits through a breach of fiduciary duty is "accountable to his principal without regard to whether or not the profit is at the expense of the principal")).

Comment b of § 43 of the Third Restatement explains:

> The basic determination that opens the way to restitution within the rule of this section is always the same: that there has been trust and confidence justifiably reposed on one side, and an advantage improperly gained on the other, either in violation of fiduciary duty or in circumstances posing so great

> a risk of violation that violation is presumed as a matter of law. *Any such advantage must be given up to the beneficiary.*
>
> Gain resulting from breach of fiduciary duty is a prime example of the unjust enrichment that the law of restitution condemns, and one function of the rule of this section is to exclude the possibility of profit from this kind of wrongdoing. An equally fundamental goal of liability under § 43, and one which may be stated without reference to unjust enrichment, is to enforce by prophylaxis the special duties of the fiduciary. Restitution offers a further safeguard, beyond the fiduciary's liability to make good any injury, protecting the reliance of the beneficiary on the fiduciary's disinterested conduct. *To this end, a liability in restitution by the rule of this section does not depend on proof either that the claimant has sustained quantifiable economic injury* or that the defendant has earned a net profit from the transaction. *It is enough that the fiduciary has acquired some asset or opportunity by a transaction in which the fiduciary was required to act solely in the interest of another.*

Third Restatement § 43, cmt. b (emphasis added).

"The duty of loyalty prohibits many transactions in which the self-interest of the fiduciary is only potentially adverse to the interest of the beneficiary. The taking of a bribe or 'secret commission' is condemned, *without regard to economic injury*, because it poses a risk of divided loyalty." *Id.* at cmt. d (emphasis added). "Many otherwise legitimate transactions are likewise condemned because of a potential conflict between the fiduciary's personal interest and the interest of the person that the fiduciary is bound to represent. This aspect of the duty of loyalty leads to strict rules against self-dealing[.]" *Id.* The obligation of "good faith bars the fiduciary from taking undue advantage of the beneficiary in direct dealings between them, and it imposes a higher standard of disclosure than would be applicable in equivalent transactions conducted at arm's length." *Id*. at cmt. e. A beneficiary may be entitled to restitution "even though the fiduciary had made no misrepresentation." *Id*.

Applying these principles to the case at hand, we hold that the circuit court erred in granting summary judgment as to Angela's unjust enrichment claim. The court appeared to reason that since the funds used to pay Evert's commission did not belong to Angela, she would not be entitled to restitution. However, as we have explained, the fact that the sellers paid the commission to Evert does not defeat the unjust enrichment claim. If the jury determines that Evert was unjustly enriched, they could award Angela damages equal to the amount of the commission, even if she did not suffer any economic loss. *See* MPJI-CV 9:32(b) ("The measure of damages for unjust enrichment is the value of the benefit conferred upon the defendant.").[12]

**JUDGMENTS ENTERED BY THE CIRCUIT COURT OF ANNE ARUNDEL COUNTY AGAINST ANGELA WALLACE AS TO COUNTS III (FRAUD), IV (BREACH OF FIDUCIARY DUTY), AND V (UNJUST ENRICHMENT) VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; APPELLEE TO PAY COSTS.**

---

[12] Evert contends that even if the unjust enrichment claim went to trial, it would have received the same outcome as the other claims in the motion for judgment under FL § 3-102. We disagree with this assertion for the same reasons that the claims of fraud and breach of fiduciary duty are not barred by the statute.